**PHARMACEUTICAL RESEARCH AND MANUFACTURERS OF AMERICA, Plaintiff,**

and

**National Urban Indian Coalition, and National Alliance for the Mentally Ill of Michigan, Intervenor–Plaintiffs,**

v.

**The Honorable Tommy G. THOMPSON, in his official capacity as Secretary, United States Department of Health and Human Services, and Thomas A. Scully, in his official capacity as Administrator, Centers for Medicare & Medicaid Services, Defendants,**

and

**Michigan Department of Community Health, Intervenor–Defendant.**

No. CIV.A.02–1306(JDB).

United States District Court, District of Columbia.

March 28, 2003.

Jeffrey David Pariser, Jeremy T. Monthy, Hogan & Hartson LLP, Washington, DC, Bert W. Rein, Michael Lee Sturm, Wiley Rein & Fielding LLP, Washington, DC, for Plaintiffs.

Vesper Mei, Office of Federal Programs, Civil Division, U.S. Department of Justice, Washington, DC, Charles J. Cooper, Washington, DC, Hamish P.M. Hume, Cooper & Kirk PLLC, Washington, DC, for Defendants.

## MEMORANDUM OPINION

BATES, District Judge.

Pharmaceutical Research and Manufacturers of America ("PhRMA") brings this case challenging a Medicaid initiative implemented by the State of Michigan's Department of Community Health ("DCH") and approved by the Secretary of the United States Department of Health and Human Services (the "Secretary" or "HHS") through the Administrator of Centers for Medicare & Medicaid Services ("CMS"). Under the initiative, unless drug manufacturers provide Michigan with rebates on drugs prescribed through Michigan's Medicaid programs (and two non-Medicaid programs) that are greater than the rebates ordinarily required under the Secretary's national Medicaid agreement, DCH may require that doctors prescribing the manufacturers' drugs to Medicaid patients must seek prior authorization from the State.

PhRMA asserts claims against HHS and CMS (the "Federal Defendants") under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, for approving portions of the initiative that PhRMA alleges violate the Social Security Act and the Commerce Clause of the Constitution. PhRMA also asserts parallel claims against DCH under the Supremacy Clause and the Commerce Clause. PhRMA is joined in certain of its claims by two plaintiff-intervenors who purport to represent the interests of Medicaid beneficiaries.

Presently before the Court are PhRMA's motion for a preliminary injunction, motions for summary judgment filed by PhRMA and the two plaintiff-intervenors, and cross-motions for summary judgment by the Federal Defendants and DCH. For the reasons stated below, the Court concludes that the challenged portions of DCH's initiative, and the Secretary's approval of those portions, withstand statutory and constitutional challenge. Accordingly, the Court grants the cross-motions for summary judgment filed by the Federal Defendants and DCH and denies PhRMA's and plaintiff-intervenors' motions for summary judgment.

## BACKGROUND

### A. Statutory Framework

Medicaid is a cooperative federal-state program aimed at "furnish[ing] (1) medical assistance ... [to] families with dependent children and [to] aged, blind, or disabled individuals, whose incomes are insufficient to meet the costs of necessary medical services, and (2) rehabilitation and other services to help such families and individuals attain or retain capability for independence or self-care." 42 U.S.C. § 1396. A state implementing Medicaid receives federal payments (known as federal financial participation or "FFP") based upon amounts expended by the state as "medical

assistance" under the program. *Id.* §§ 1396b(a)(1), 1396d(b). In order to be eligible for FFP, a state must design, and obtain the Secretary's approval for, a state plan for implementing Medicaid. *Id.* §§ 1396, 1396a. The state plan must comply with numerous requirements, including that it "provide such safeguards as may be necessary to assure that eligibility for care and services under the plan will be determined, and such care and services will be provided, in a manner consistent with simplicity of administration and the best interests of the recipients." *Id.* § 1396a(a)(19).

This case centers around 42 U.S.C. § 1396r–8, which establishes a scheme under Medicaid for "Payment for covered outpatient drugs." Subsection (a) of that provision specifies that states are only eligible for FFP with respect to outlays on prescription drugs where the drugs are purchased from a manufacturer that has entered into an agreement with the Secretary on behalf of states (or with a state itself) to provide rebates on its products. *See id.* § 1396r–8(a)(1). Subsection (d) sets forth the circumstances under which a state may limit coverage of drugs. Among other things, subsection (d) allows a state to "subject to prior authorization any covered outpatient drug." *Id.* § 1396r–8(d)(1)(A). It also provides that a state may exclude a drug from a "formulary" only if, *inter alia,* "the excluded drug does not have a significant, clinically meaningful

therapeutic advantage." *Id.* § 1396r–8(d)(4)(C).

## B. The Michigan Best Practices Initiative

In an effort to reduce its Medicaid expenditures, the State of Michigan has instituted a prescription drug program known as the Michigan Best Practices Initiative (the "Initiative"). Pursuant to the Initiative, Michigan established a committee of physicians and pharmacists (the "Committee") to review the scientific and clinical information concerning approximately 40 therapeutic classes of drugs on the "Michigan Pharmaceutical Product List" (the "MPPL"), a list of drugs available for reimbursement under Michigan's Medicaid program. Administrative Record ("AR") 373, 395–96. The 40 or so therapeutic classes of drugs reviewed by the Committee "account for the majority of increased drug spending in the Michigan Medicaid Program." *Id.* at 395.

The Committee sought to identify—based on clinical effectiveness and safety—at least two drugs in each therapeutic class that were the "best in class." *Id.* at 373, 395. Under the Initiative, these "best in class" drugs may be prescribed by physicians to Medicaid patients without the need for prior authorization. *Id.* at 395–97.[1]

---

1. Certain statements in the Administrative Record suggest that cost may have been factored into the identification of the "best in class" drugs. *See* AR at 395 ("best in class" designation means "that based on clinical effectiveness, safety, outcomes, and cost they should be offered without the need for prior authorization"); *id.* at 398 ("[T]he physician and other prescribers can prescribe the best clinically, cost effective product for the beneficiary without prior authorization."). In materials supplied by DCH outside the administrative record (and later incorporated into a supplemental administrative record), DCH

clarified that cost was not a factor in identifying "Therapeutically Advantageous" (i.e., "best in class") drugs and in concluding that those drugs would not be subject to prior authorization. Supplemental Administrative Record (AR Volume III) ("SAR") at 305. The Committee did, however, identify the lowest priced Therapeutically Advantageous drug in each class, and designate it as a "Reference Drug." *Id.* The Committee then determined that all other drugs in the same class that were not Therapeutically Advantageous and that were priced significantly above the best price for the Reference Drug anywhere in the

In contrast, drugs in each therapeutic class that are priced unfavorably compared to the lowest priced "best in class" drug are designated on the MPPL as subject to prior authorization. *Id.* at 373–5, 397. That is, in order for a patient's use of an unfavorably priced non-"best in class" drug to be reimbursed under the Medicaid program, a physician must proceed through an administrative process to obtain approval from the State of Michigan's pharmacy benefit manager to prescribe the drug. *Id.* Requests for prior authorization are processed within a 24–hour period and a 72–hour supply of a medically necessary covered drug is provided in an emergency situation. *Id.* at 4.

Under the Initiative, manufacturers whose drugs are not identified as "best in class" can still ensure that their drugs are available without prior authorization, provided that they sign two agreements with the State of Michigan. *Id.* at 304–05, 380. First, a drug manufacturer must sign, on a drug-by-drug basis, an agreement requiring the manufacturer to provide a rebate that effectively reduces the price of its drug to that of the "best-priced clinically selected product" in the class—i.e., to the lowest price available in the United States for the lowest priced "best in class" drug in the relevant therapeutic class. *See* AR at 7–14; SAR at 307. This agreement is denominated a "Supplemental Drug Rebate Agreement" because the rebate is over and above the rebate that a manufacturer is otherwise required to provide under the rebate agreement negotiated by the Secretary and the manufacturer under the Social Security Act. *See* 42 U.S.C. § 1396r–8(c)(1); DCH's Statement of Uncontested Facts ¶ 11. Second, a manufacturer must sign a "Non–Medicaid Agree-

ment" requiring it to provide rebates on its drugs prescribed under certain non-Medicaid programs; those rebates effectively reduce the prices for those drugs to the prices of the "best-priced clinically selected product" for each class. *See* SAR at 306–08, 717–724. Previously, nothing under the Social Security Act or Michigan's Medicaid program required manufacturers to provide any rebates with respect to these non-Medicaid programs.

Pursuant to the requirements of the Social Security Act, *see* 42 U.S.C. § 1396, in the fall of 2001, DCH submitted to the Secretary for approval a proposed State Plan Amendment ("SPA") to Michigan's State Medicaid Plan that would accommodate the new prescription drug program under the Initiative. CMS thereafter requested that DCH make certain changes to the proposed SPA, including specifically that DCH clarify that "the State Plan Amendment and State of Michigan Supplemental Drug Rebate Agreement ... require drug rebates with respect to the Medicaid population only." AR at 100. In response, DCH removed from its proposed Supplemental Drug Rebate Agreement "all references to non-Medicaid state funded pharmacy programs" and "included a statement in the SPA that the supplemental rebate contained in the SPA is for the Medicaid population only." *Id.* at 58.

On January 24, 2002, the Secretary approved the SPA—"SPA 01–015"—and the specific terms of the Supplemental Drug Rebate Agreement. *Id.* at 1. On February 1, 2002, DCH began pre-implementation testing of the Initiative, and by March 19, 2002, the Initiative was fully operational.

United States (i.e., the price of the "best-priced clinically selected product") would be subject to prior authorization. *Id.* at 305–07. The rebate agreements, discussed below, are targeted to reduce the price of non-Therapeutically Advantageous drugs to the best price in the United States for the relevant Reference Drug. *Id.* at 306–07.

## C. Procedural History

On June 28, 2002, PhRMA filed a complaint and a motion for a preliminary injunction in this Court challenging the Secretary's approval of SPA 01–015 on four grounds: (1) that it establishes an "illegal drug formulary" in violation of 42 U.S.C. § 1396r–8(d), Compl. ¶¶ 61–68; (2) that it permits "supplemental rebates" in addition to and above the rebates permitted under the Social Security Act in violation of 42 U.S.C. § 1396r–8(a)(1), Compl. ¶¶ 69–74; (3) that it "imposes prior authorization on Medicaid prescription drugs in the event that manufacturers refuse to provide rebates to members of the non-Medicaid population in Michigan," in violation of the "best interests" requirement of 42 U.S.C. § 1396a(a)(19), Compl. ¶¶ 75–82; and (4) that the "price benchmarking" mechanisms in both the Supplemental Drug Rebate Agreement and the Non–Medicaid Agreement violate the Commerce Clause because they tie in-state drug prices to drug prices outside of Michigan, Compl. ¶¶ 83–88. Pursuant to an agreement of the parties, the Court entered an order for a briefing schedule on the motion for a preliminary injunction and set a hearing date of August 28, 2002.

The subsequent procedural history of this case is complex, but bears review to illustrate the evolution of the claims and defenses in this litigation. On July 25, 2002, DCH moved to intervene as a defendant, claiming that it was the "true party-in-interest" and that it was best situated to explain and defend the Initiative. Mem. Supp. DCH's Mot. Intervene at 2. On July 29, 2002, the Court granted DCH's motion. Three weeks later, the Court granted a motion to intervene as plaintiffs by the National Alliance for the Mentally Ill of Michigan ("NAMI"), an organization that purports to represent the interests of the mentally ill of Michigan and their families, and the National Urban Indian Coalition ("NUIC"), an organization that purports to represent the interests of American Indians living in urban areas, many of whom are Medicaid recipients, and the interests of urban Indian Centers, which provide assistance to those persons. NAMI and NUIC joined in PhRMA's motion for a preliminary injunction but their allegations were (and are) limited to the contention that the Secretary acted unlawfully in approving components of the Initiative because they violate the formulary requirements of § 1396r–8(d)(4) and are contrary to the "best interests" of Medicaid recipients, *see* 42 U.S.C. § 1396a(a)(19).

On August 27, 2002, one month after DCH intervened in the case, and the day before the hearing on the motion for a preliminary injunction, PhRMA amended its complaint to add claims against DCH under the Supremacy Clause and the Commerce Clause. These claims roughly parallel the claims asserted against the Federal Defendants.[2] The Court advised PhRMA that it would not consider the claims against DCH for the purposes of evaluating the motion for a preliminary injunction.[3]

---

**2.** The principal difference is that the claims asserted against the Federal Defendants are based upon the Secretary's "approval" of the Michigan Initiative while the claims against DCH are based upon its "implementation" of the Initiative. In addition, whereas PhRMA asserted one claim against the Federal Defendants for "approving programs leveraging Medicaid to exploit beneficiaries for the benefit of non-Medicaid individuals," it asserted separate claims against DCH for implementing such programs with the approval of the Secretary and for implementing such programs without the approval of the Secretary.

**3.** Prior to the August 28, 2002, hearing, the Court received two amici curiae briefs supporting the Federal Defendants, one from the Florida Drop-in Center Association and the International Patient Advocacy Association,

At the August 28, 2002, hearing, the Federal Defendants took the position that, because SPA 01–015 as approved concerned Michigan's Medicaid population only, there was no agency action for the Court to review with respect to the Initiative's requirement that manufacturers provide rebates for drugs prescribed to non-Medicaid populations in order to avoid Medicaid prior authorization. Counsel for the Federal Defendants explained that "right now there's no requirement for approval of this sort of program by either statute or regulation, and the state had no basis for assuming that approval was required in this sort of case." Tr. of Aug. 28, 2002, Hearing at 65.

One month later, the Federal Defendants had changed course. The Court received notice from the Federal Defendants that on September 18, 2002, the Director of CMS issued a letter to State Medicaid Directors (the "SMD Letter") stating that: (1) "States may enter separate or supplemental drug rebate agreements as long as such agreements achieve drug rebates equal to or greater than the drug rebate set forth in the Secretary's national rebate agreement with drug manufacturers"; (2) "[a] prior authorization program does not need to comply with the requirements for restrictive formularies"; (3) "States may subject covered outpatient prescription drugs to prior authorization as a means of encouraging drug manufacturers to enter into separate or supplemental rebate agreements for covered drugs purchased by Medicaid recipients"; (4) states may establish "a prior authorization program for Medicaid covered drugs to secure drug benefits, rebates or discounts for non-Medicaid populations" where the "prior autho-

rization program will further the goals and objectives of the Medicaid program"; and (5) CMS expects that states seeking to establish prior authorization programs as a means of encouraging rebates for either Medicaid or non-Medicaid populations will submit a proposed state plan amendment for approval by the Secretary. See Fed. Defs.' Notice Supp. Auth. (Sept. 27, 2002), Ex. A. The Federal Defendants further advised the Court that, consistent with the SMD Letter, DCH on September 23, 2002, submitted to the Secretary for review a proposed SPA "regarding its supplemental rebate/prior authorization program for certain groups of non-Medicaid eligible individuals who are either very low income or have extraordinary medical needs." Fed. Defs.' Notice Supp. Auth. (Sept. 27, 2002) at 3. On October 9, 2002, the Federal Defendants explained that CMS anticipated issuing a decision on DCH's proposed SPA within the next three weeks. CMS did not meet that goal.

The Court held a conference with the parties and intervenors several weeks later, on December 6, 2002, to receive an update on the status of the proposed SPA ("SPA 02–019"). The Federal Defendants informed the Court that, on the preceding day, the Secretary had approved SPA 02–019, which required that a manufacturer agree to provide rebates in two of Michigan's non-Medicaid programs, the Elder Prescription Insurance Company Program ("EPIC") and the Maternity Outpatient Medical Service ("MOMS"), in order to guarantee that the manufacturer's drugs would be available to Medicaid recipients without prior authorization. The Federal Defendants submitted an administrative

and one from the State of West Virginia, State of Vermont, State of North Dakota, State of New Mexico Human Services Department, State of Missouri Department of Social Services, State of Maryland, State of Maine, State of Louisiana Department of Health and Hospitals, State of Hawaii, State of Florida Agency for Health Care Administration, and the Commonwealth of Kentucky.

record and a decision letter supporting the Secretary's determination. *See* SAR at 712–715.

The Federal Defendants further advised the Court that SPA 02–019, as initially submitted, would have required that, as a condition to evading Medicaid prior authorization, drug manufacturers participate in two other non-Medicaid programs in addition to EPIC and MOMS. DCH withdrew the portion of its proposed SPA with respect to these two other programs, the State Medical Program ("SMP") and the Children's Special Health Care Services Program ("CSHCS"), on December 3, 2002. *Id.* at 708. At the December 6, 2002, conference, DCH nevertheless informed the Court that it had been requiring, and would continue to require, manufacturers to provide rebates with respect to SMP and CSHCS, as well as EPIC, MOMS, and Medicaid itself, in order to guarantee that their drugs would be available to Medicaid recipients without prior authorization. *See id.* at 708–709. DCH asserted that it did not believe that the Secretary's approval was required for the implementation of the non-Medicaid aspects of the Initiative.

On December 13, 2002, pursuant to a briefing schedule established by the Court, PhRMA and plaintiff-intervenors submitted motions for summary judgment, and PhRMA submitted a supplemental motion for a preliminary injunction. The Federal Defendants and DCH cross-moved for summary judgment one week later. On January 6, 2003, prompted by an argument in DCH's brief that PhRMA's complaint against DCH did not comply with *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), PhRMA moved for leave to amend its complaint a second time to name the Director of DCH, rather than DCH itself, as the defendant on PhRMA's

Supremacy Clause and Commerce Clause claims.

A hearing on the outstanding motions was held on February 5, 2003. At the hearing, the Federal Defendants advised the Court that DCH had recently submitted a new proposed SPA ("SPA 02–21") with respect to the SMP and CSHSC programs. Nevertheless, as before, DCH maintained that it could maintain a linkage between the SMP and CSHCS programs and its Medicaid prior authorization program despite the absence of approval from the Secretary. The Federal Defendants, for their part, argued that there was as yet no agency action for the Court to review with respect to the SMP and CSHCS programs and that the Court lacked authority to order the Secretary to initiate a compliance action against DCH for operating an unapproved program. PhRMA, NAMI, and NUIC took the position that either DCH's implementation of the SMP and CSHCS aspects of the Initiative without the Secretary's approval was unlawful or the Secretary had *de facto* approved those aspects by declining to halt them. The Court urged CMS to review DCH's proposed amendment concerning the SMP and CSHCS programs expeditiously and expressed its continuing frustration (and skepticism) regarding CMS's piecemeal approach to its review of the Initiative—an approach that had already substantially delayed the progress of this litigation.

Nine days later, the Federal Defendants filed a decision document and supporting administrative record denying approval for SPA 02–21. DCH, in turn, advised the Court that although it expected to appeal the denial to the Sixth Circuit, in the interim it would not continue to require that manufacturers sign rebate agreements concerning the SMP and CSHCS programs as a condition for avoiding Medicaid prior authorization. *See* Notice of DCH's

Discontinuance of Certain Portions of the Mich. Initiative at 1–2.

## ANALYSIS

### I. Summary Judgment Standard

Summary judgment is appropriate when the pleadings and the evidence demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The party seeking summary judgment may successfully support its motion by "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)). In opposing summary judgment, the "nonmoving party [must] go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 56(c), (e)). In determining whether there exists a genuine issue of material fact sufficient to preclude summary judgment, the court must regard the nonmovant's statements as true and accept all evidence and make all inferences in the nonmovant's favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A nonmoving party, however, must establish more than the "mere existence of a scintilla of evidence" in support of its position. *Id.* at 252, 106 S.Ct. 2505. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50, 106 S.Ct. 2505 (internal citations omitted).

### II. Standing

Before considering the merits of the claims asserted in this litigation, the Court must assess as a threshold matter PhRMA's, NAMI's and NUIC's standing. *See La. Envtl. Action Network v. Browner*, 87 F.3d 1379, 1382 (D.C.Cir.1996) ("[B]efore we reach the merits of any claim, we must first assure ourselves that the dispute lies within the constitutional and prudential boundaries of our jurisdiction."). There are, of course, two principal forms of standing, "Article III (case or controversy)" standing and "prudential" standing, each of which must be considered. *Mudd v. White*, 309 F.3d 819, 823 (D.C.Cir.2002).

#### A. Constitutional Standing

Article III standing entails three requirements:

First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'" Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

The party invoking federal jurisdiction bears the burden of establishing these elements. Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof,

i.e., with the manner and degree of evidence required at the successive stages of the litigation.

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (internal citations omitted).

■ Because PhRMA, NUIC, and NAMI are all associations purporting to bring claims on behalf of their members, a further layer of standing requirements must also be satisfied. Specifically, each association must demonstrate that (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the association's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 342, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977).

## 1. PhRMA

■ Here, there is no real dispute that PhRMA satisfies the Article III requirements for bringing a case on behalf of its members, who are drug manufacturers seeking to sell their products for use in Michigan's Medicaid program and elsewhere. These drug manufacturers allegedly suffer cognizable injury, specifically, economic harm, as a result of the implementation of the Initiative and the Secretary's approval of components of it. *See, e.g.*, Declaration of John Alivernini ¶¶ 8–11; Declaration of George Bilyk ¶¶ 8–11; Declaration of Russel A. Banthan ¶¶ 11–13, 15. Moreover, this lawsuit is undoubtedly

germane to PhRMA's purpose, which is to serve as the pharmaceutical industry's principal policy advocate. Banthan Decl. ¶¶ 4–5; *see Humane Soc'y of the U.S. v. Hodel*, 840 F.2d 45, 56 (D.C.Cir.1988) (germaneness prong requires "only that an organization's litigation goals be pertinent to its special expertise and the grounds that bring its membership together"). In addition, PhRMA's claims can be resolved on the basis of the record compiled for the Court without the participation of PhRMA's individual members.

The more challenging questions of constitutional standing concern the plaintiff-intervenors NAMI and NUIC.

## 2. NAMI

■ NAMI is an organization representing the interests of Michigan residents who are diagnosed with major mental illnesses. Affidavit of Hubert Huebl, M.D. ¶ 7. It intervened in this lawsuit to assert the interests of Medicaid beneficiaries under 42 U.S.C. § 1396a(a)(19), and, in particular, to assert that the Secretary had approved an illegal formulary that was contrary to the "best interests" of Medicaid beneficiaries. DCH challenges NAMI's constitutional standing to participate in this lawsuit.[4]

Like PhRMA, NAMI must satisfy the three-part test for associational standing described in *Hunt*. There is little doubt that the claim asserted by NAMI is germane to its purpose, which includes advocating for policies and legislation that will

---

4. Strictly speaking, the Court need not consider whether NAMI has standing to bring this suit because, as discussed below, either PhRMA or NUIC has constitutional and prudential standing to assert the various claims raised in this case. *See Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1232 (D.C.Cir.1996) ("For each claim, if constitutional and prudential standing can be shown for at least one plaintiff, we need not consider the standing of the other plaintiffs to raise that claim."). However, in the interest of providing a full discussion of the issues raised in this matter, which has been extensively briefed by the parties over the past several months, the Court will address DCH's argument that NAMI lacks standing.

improve the quality of treatment available to persons with serious mental illness. *Id.* ¶ 8. Furthermore, there is no need for NUIC's individual members to participate in the lawsuit.

The critical question as to NAMI's standing is whether any of its members would have standing to sue in their own right. DCH argues that NAMI has not demonstrated that it even has members who themselves suffer from mental illness, much less members who participate in the Medicaid fee-for-service program at issue and have suffered or will suffer actual or imminent injury. Notably, the affidavit submitted by NAMI's president in connection with its motion to intervene appears crafted to evade the question whether NAMI's current membership actually includes mentally ill persons or only the family members of such persons. *See id.* ¶ 5 ("NAMI–Michigan's membership is comprised of family members of persons with several mental illness, and over the past decade, mental health consumers have become members of the organization as well.").

Three weeks after the February 5, 2003, summary judgment hearing, at which the Court expressed some concern on this issue, and two months after DCH first challenged NAMI's standing, NAMI filed with the Court a declaration explaining that NAMI's membership does, indeed, include mental health consumers, in particular "consumer members ... enrolled in Medicaid fee-for-service." Declaration of Fred Cummins ¶¶ 2–5. Although inexplicably belated, this evidence certainly goes a long way towards remedying a key omission from NAMI's earlier submission.

But still missing in NAMI's materials is any specific factual support that a particular member of NAMI has suffered, or imminently will suffer, concrete harm as a result of the Secretary's approval of components of the Initiative. Although NAMI's president, Dr. Hubert Huebl, affirms that "mental health consumers" and "constituents" have experienced hardships since the Initiative began—delay in approval for (or outright denial of) medications they have been receiving, decompensation, re-hospitalization, and switching of medications without their guardians' knowledge, *see* Huebl Aff. ¶¶ 10, 15, 23, 25–27—it remains unclear, even after NAMI's recent submission, whether the particular injured "mental health consumers" and "constituents" referenced by Dr. Huebl are in fact members of NAMI, or whether NAMI is merely alleging an interest aligned with those persons. Moreover, Dr. Huebl's highly generalized description of the injuries suffered by these "mental health consumers" and "constituents"—a description that fails to identify by name any allegedly injured person and lacks supporting details concerning the circumstances of any specific incident of harm— begs the question whether Dr. Huebl even has personal knowledge that enables him to provide competent testimony that individuals have been injured as a result of the Initiative.[5] Accordingly, given the late stage of the litigation, NAMI's submissions fall short of meeting its burden to establish standing. *See Sierra Club v. EPA,* 292

---

5. Moreover, NAMI cannot rest its standing on speculation that some mental health consumer who is a member of NAMI will eventually be injured by the Secretary's action. *See Defenders of Wildlife,* 504 U.S. at 564 n. 2, 112 S.Ct. 2130 (injury must be "certainly impending"). Indeed, in light of the fact that the Initiative has been operational for over a year, NAMI's inability to identify a single instance of concrete harm to one of its members undermines any suggestion that such injury is inevitable, much less imminent. Article III requires that NAMI demonstrate that its interest in this lawsuit is tied to some concrete injury and is not merely abstract and philosophical.

F.3d 895, 899 (D.C.Cir.2002) ("On a motion for summary judgment ... 'the plaintiff can no longer rest on such 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts.' " ' (quoting *Defenders of Wildlife*, 504 U.S. at 561, 112 S.Ct. 2130)).

### 3. NUIC

■ NUIC is a newly formed non-profit organization purporting to "represent[ ] a united front of Urban Indians, Urban Indian Centers, urban Tribes and National Urban Indian organizations from across the United States in order that urban Indians do not lose additional programs and services." Declaration of Patricia Newada ¶ 3; *see also* Declaration of Fay Givens ¶¶ 2–3. NUIC asserts that two elements of its constituency—individual Medicaid beneficiaries and urban Indian Centers that provide services to low-income urban Indians—have been harmed by the Initiative. First Am. Compl. of Pl. Intervenors ¶ 10. Like NAMI, NUIC alleges that the Secretary's approval violates the formulary provisions of 42 U.S.C. § 1396r–8(d) as well as the "best interests" provision of 42 U.S.C. § 1396a(a)(19).

No question has been raised as to whether this lawsuit is germane to NUIC's purpose or whether NUIC's individual members are needed to participate in the litigation. DCH does, however, raise a challenge under the first of the three *Hunt* criteria, arguing that NUIC has not established that it has members who are Medicaid beneficiaries and thus who could sue in their own right.

The Court agrees with DCH that although NUIC purports to represent a "united front" including "Urban Indians," NUIC has, in fact, failed to demonstrate that its membership includes any individuals who are Michigan Medicaid fee-for-service recipients. Indeed, although NUIC has submitted several declarations

from Michigan Medicaid recipients, none of those persons claims to be a member of NUIC.

NUIC has, however, established that its membership includes urban Indian Centers, "stand-alone non-profit Indian controlled organizations" that provide programs and services to urban Indians. Newada Decl. ¶ 3. Among NUIC's members is American Indian Services, Inc. ("AIS"), which provides urban Indians in the Detroit, Michigan, area with food, transportation, housing, help with utility bills and water bills, and financial assistance for prescription drugs. Givens Decl. ¶ 3, 8. AIS's Executive Director, who is also the President of NUIC, explains that many urban Indians rely upon Medicaid to cover their health care needs, and that since the Initiative began, AIS has "noticed a substantial increase in the number of Native Americans asking [AIS] to purchase prescription drugs on their behalf, because these drugs are not available to them through Medicaid." *Id.* ¶¶ 4, 7. AIS provides the requested assistance with monies from its restricted funds, thus diverting monies that would otherwise be allocated towards providing food, transportation, housing and other assistance. *Id.* ¶¶ 7–8. If the Initiative is allowed to continue, AIS claims, the provision of prescription medication will ultimately crowd-out AIS's provision of other services for urban Indians. *Id.* ¶ 8.

■ Precedents in the Supreme Court and in this Circuit make clear that where an organization is frustrated in its ability to carry out its programs and experiences a drain on its resources due to a defendant's alleged actions, the organization has standing to sue in its own right. *See, e.g., Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982) (frustration of organization's ability to carry out its mission, and drain on organization's resources, sufficient to con-

fer standing); *Fair Employment Council of Greater Wash., Inc. v. BMC Marketing Corp.*, 28 F.3d 1268, 1276 (D.C.Cir.1994) (allegations that defendant's actions interfered with organization's programs and caused organization to expend resources sufficient to confer standing); *Nat'l Fair Housing Alliance v. Prudential Ins. Co. of Am.*, 208 F.Supp.2d 46, 53 (D.D.C.2002) (expenditure of scare resources as a result of defendant's action sufficient to confer standing). Consistent with these cases, AIS would have standing to sue in its own right because, allegedly as a result of the Initiative, its ability to provide housing, food, transportation, and other services is being adversely impacted by its increased need to devote resources to prescription drugs. NUIC, in turn, thus has associational standing under *Hunt* to bring a claim based upon alleged harm to AIS and other urban Indian Center members.[6]

### B. Prudential Standing

■ Having determined that PhRMA and NUIC both have constitutional standing to pursue their claims, the Court must proceed to assess prudential standing. The Court need not evaluate the prudential standing of both PhRMA and NUIC with respect to each claim. As the D.C. Circuit has explained, "if constitutional and prudential standing can be shown for at least one plaintiff" with respect to each claim asserted, the Court "need not consider the standing of the other plaintiffs to raise that claim." *Mountain States Legal Found.*, 92 F.3d at 1232.

■ Prudential standing requirements are " 'judicially self-imposed limits on the exercise of federal jurisdiction' " that may be modified by Congress. *Bennett v. Spear*, 520 U.S. 154, 162, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) (quoting *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984)). "[A]mong these prudential requirements is the doctrine of particular concern in this case: that a plaintiff's grievance must arguably fall within the zone of interests protected

---

**6.** Although the President of NUIC indicated in her declaration that AIS is a "member" of NUIC, *see* Givens Decl. ¶ 3, at the February 5, 2003, hearing, counsel for NUIC suggested that the structure of NUIC is somewhat loose and that its supporters do not receive a "formal membership card." Tr. of Feb. 5, 2003, Hearing at 47. This statement does give the Court some pause.

However, the Court is satisfied that even if NUIC is not a traditional membership organization it is sufficiently similar to the non-traditional organization that passed muster in *Hunt*, 432 U.S. at 343–45, 97 S.Ct. 2434, for the Court to conclude that NUIC may bring a claim on behalf of AIS and other urban Indian Center "members." Like the organization in *Hunt*, NUIC serves a "specialized segment of the state's ... community," *id.* at 344, 97 S.Ct. 2434,—urban Indian Centers—and its constituents possess certain "indicia of membership," *id.* at 344–45, 97 S.Ct. 2434,namely, Executive Directors of urban Indian Centers serve as NUIC's President and Vice President. Newada Decl. ¶ 1; Givens Decl. ¶ 1.

Moreover, NUIC stands in stark contrast to two non-traditional organizations that the D.C. Circuit has concluded did not have standing. *See Fund Democracy, LLC v. SEC*, 278 F.3d 21, 25–26 (D.C.Cir.2002) (no standing for one-person business purporting to represent tens of millions of individual investors, where no evidence of any alleged supporter who funded or approved of organization's activities); *Am. Legal Found. v. FCC*, 808 F.2d 84, 90 (D.C.Cir.1987) (no standing for organization that did not represent a "discrete, stable group of persons with a definable set of common interests" and organization's supporters did not appear to play any role in selecting its leadership or guiding or funding its activities). Unlike the D.C. Circuit in *Fund Democracy* and *American Legal Foundation,* this Court need not be concerned that the association before it is pursuing this litigation for reasons other than to advance the interests of its supporters. *See Fund Democracy,* 278 F.3d at 26; *Am. Legal Found.,* 808 F.2d at 90.

or regulated by the statutory provision or constitutional guarantee invoked in the suit." *Id.* Under this doctrine, a plaintiff will be denied a right of review if its "interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Clarke v. Sec. Indus. Ass'n,* 479 U.S. 388, 399, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987). The D.C. Circuit has clarified that the inquiry "focuses, not on those who Congress intended to benefit, but on those who in practice can be expected to police the interests that the statute protects." *Mova Pharm. Corp. v. Shalala,* 140 F.3d 1060, 1075 (D.C.Cir.1998).

A court must conduct the "zone of interests" inquiry with " 'reference to the particular provision of law upon which the plaintiff relies.' " *Grand Council of the Crees (of Quebec) v. FERC,* 198 F.3d 950, 956 (D.C.Cir.2000) (quoting *Bennett v. Spear,* 520 U.S. at 175–76, 117 S.Ct. 1154). Although the court looks at that provision "in combination with other provisions to which it bears an 'integral relationship,' " *Nat'l Petrochem. & Refiners Ass'n v. EPA,* 287 F.3d 1130, 1147 (D.C.Cir.2002) (quoting *Fed'n for Am. Immigration Reform, Inc. v. Reno,* 93 F.3d 897, 903 (D.C.Cir.1996)), "Congress's purposes in enacting the overall statutory scheme are relevant only insofar as they may help reveal its purpose in enacting the particular provision." *Grand Council of the Crees (of Quebec),* 198 F.3d at 956 (emphasis omitted). Importantly, the zone of interests test is not meant to be "especially demanding." *Clarke,* 479 U.S. at 399, 107 S.Ct. 750.

### 1. "Illegal Formulary"

The first claim raised in this litigation, which is asserted by both PhRMA and NUIC, is that DCH's prior authorization program operates as an "illegal formulary" in violation of 42 U.S.C. § 1396r–8(d)(4). That provision sets forth requirements for excluding drugs from a formulary in a state Medicaid program, among other things specifying that a drug may only be excluded if it lacks a clinically meaningful therapeutic advantage. The requirements in subsection (d)(4) appear on their face to be targeted at protecting beneficiaries' interests in maximizing the pool of medications available under Medicaid.

At a surface level, the interests of profit-seeking drug manufacturers do not seem to be protected by § 1396r–8(d)(4). But when states seek to exclude drugs from Medicaid coverage, the interests of Medicaid beneficiaries and the interests of drug manufacturers in fact are very much aligned. Indeed, in practice, drug manufacturers "can be expected to police" improper limitations on the availability of prescription drugs to Medicaid beneficiaries. *See Mova Pharm. Corp.,* 140 F.3d at 1075. Given that Congress considered drug manufacturers to be integral participants in the scheme for providing discounted drugs to beneficiaries, it is at least arguable that Congress anticipated that manufacturers would rally with beneficiaries against undue state restrictions on access to prescription drugs under § 1396r–8(d)(4). Thus, in light of the relative laxness of the prudential standing test, *see Clarke,* 479 U.S. at 399, 107 S.Ct. 750, there is a firm basis upon which to conclude that PhRMA has prudential standing to raise its "illegal formulary" claim.[7]

---

7. In *TAP Pharms. v. United States Dep't of Health & Human Servs.,* 163 F.3d 199, 208 (4th Cir.1998), the Fourth Circuit concluded that a drug manufacturer did not have pru-

dential standing to bring a claim concerning a Medicare reimbursement policy, holding that "where a statute defines a group subject to its provisions, a party asserting only commercial

But in any event it is plain that NUIC has prudential standing to bring a challenge under the formulary provisions. As discussed above, urban Indian Centers such as AIS not only have a philosophical interest in ensuring that indigent urban Indians receive Medicaid services, but they also suffer concretely themselves when they must divert funds towards providing assistance with prescription drugs to compensate for restrictions on beneficiaries' access. The interests of the urban Indian Centers thus "coincide—i.e., systematically, not fortuitously," *see Hazardous Waste Treatment Council v. Thomas*, 885 F.2d 918, 924 (D.C.Cir.1989), with the interests in maximizing the availability of drugs to beneficiaries that § 1396r–8(d)(4) was meant to protect. By implication, NUIC, which represents the interests of urban Indian Centers such as AIS, has prudential standing to assert a claim under § 1396r–8(d)(4).

### 2. Supplemental Rebate

 PhRMA's second claim against the Federal Defendants, which is not joined by NUIC, is that the supplemental rebate that DCH seeks from drug manufacturers violates 42 U.S.C. § 1396r–8(a)(1), which requires the Secretary to enter into a rebate agreement with a manufacturer or authorize state rebate agreements with a manufacturer. The evident purpose of § 1396r–8(a)(1) is to secure for the government a discount off the market price of pharmaceuticals. *See PhRMA v. Thompson*, 251 F.3d 219, 226 (D.C.Cir. 2001) ("[I]t is … obvious that Congress's purpose in requiring manufacturer rebates was to reduce the cost of the Medicaid program.").[8]

Importantly, § 1396r–8(a)(1) is intertwined with the other provisions of subsections (a), (b), and (c), which not only set forth several requirements for rebate agreements but also impose specific obligations upon drug manufacturers with respect to their participation in the rebate scheme. In other words, § 1396r–8(a)(1), understood in connection with the related aspects of subsections (a), (b), and (c) of § 1396r–8, is a means of regulating manufacturers' provision of rebates.

Seen in this light, PhRMA's complaint that the DCH rebate agreements approved by the Secretary are inconsistent with the rebate scheme intended by Congress "is arguably within the zone of interests to be protected or regulated" by § 1396r–8(a)(1). *See Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). It is reasonable to conclude that Congress intended to allow manufacturers to bring suit for an alleged improper approval by the Secre-

---

interests satisfies the zone of interests test only if its interests put it in the same position as a member of the subject group or a commercial competitor of such a group." *See also Amgen Inc. v. Scully*, 234 F.Supp.2d 9, 25 (D.D.C.2002) (drug company did not have prudential standing to challenge CMS rule concerning Medicare reimbursement). The Court queries whether in "hew[ing] closely to the particulars of Supreme Court precedent," 163 F.3d at 207, the Fourth Circuit has adopted an overly restricted interpretation of the zone of interests test. As noted above, the D.C. Circuit has explained that "those who in practice can be expected to police the interests that the statute protects" may satisfy the

prudential standing inquiry. *Mova Pharm. Corp.*, 140 F.3d at 1075. In any event, the Medicare provisions in *TAP Pharms.* are not sufficiently analogous to the particular Medicaid formulary provision at issue here to be highly instructive.

**8.** In *PhRMA v. Thompson*, 251 F.3d at 221, a case in which the language of § 1396r–8(b)(1)(A) played a "central" role, the D.C. Circuit reached the merits of PhRMA's challenge to a Medicaid demonstration project, but did not expressly consider PhRMA's prudential standing to bring suit.

tary of a state rebate agreement because, although the manufacturers are not themselves the direct subjects of the Secretary's approval, the manufacturers are as a practical matter regulated by that action. Therefore, PhRMA, as a representative of drug manufacturers affected by allegedly improperly approved state rebate agreements, has prudential standing to proceed with a challenge under § 1396r–8(a).

### 3. "Best Interests"

█ PhRMA's third claim, which is joined by NUIC, is that the Secretary's approval of DCH's use of prior authorization as a means to encourage rebates in non-Medicaid programs violates 42 U.S.C. § 1396a(a)(19). That provision requires that a state Medicaid plan "provide such safeguards as may be necessary to assure that . . . care and services will be provided, in a manner consistent with simplicity of administration and the best interests of [Medicaid] recipients." 42 U.S.C. § 1396a(a)(19). As is plain from the language of § 1396a(a)(19), the "best interests" requirement is intended to protect the administration of the Medicaid program and the interests of Medicaid recipients with respect to their health care.

There is certainly some question as to whether PhRMA has standing to raise a "best interests" claim under § 1396a(a)(19). Although as noted above, the interests of drug manufacturers may be aligned with those of beneficiaries in the context of state attempts to exclude drugs from a formulary under § 1396r–8(d)(4), it is far less evident that the interests of drug manufacturers "coincide—i.e., systematically, not fortuitously," see *Hazardous Waste Treatment Council*, 885 F.2d at 924, with the "best interests" of Medicaid recipients more generally. Indeed, there is an inherent tension between the interests of beneficiaries and those

who are supplying (for profit) the drugs being used.

Regardless, it is clear enough that NUIC has prudential standing to raise this claim. AIS and other urban Indian Centers that provide assistance to Medicaid beneficiaries have an interest in minimizing beneficiaries' burdens under Medicaid lest the beneficiaries seek from the Centers additional funds for health care that were to be allocated for food, housing, and other uses. The Centers thus have interests virtually congruent with those of beneficiaries under the "best interests" requirement of subsection (a)(19). Moreover, the harm allegedly suffered by the Centers as a result of restrictions in Medicaid means that the Centers "in practice can be expected to police" threats to the beneficiaries' interests—just as they have (through NUIC) by bringing this litigation. *See Mova Pharm. Corp.*, 140 F.3d at 1075. Certainly, it cannot be said that the interests of urban Indian Centers that provide assistance to indigent Native Americans are "so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Clarke*, 479 U.S. at 399, 107 S.Ct. 750. Accordingly, NUIC, if not PhRMA, can proceed with its "best interests" claim under § 1396a(a)(19).

### 4. Constitutional Provisions

█ The remaining provisions to be assessed for prudential standing purposes are the Commerce Clause and the Supremacy Clause, which are relevant only on claims asserted by PhRMA. No party seriously contests PhRMA's standing to raise a challenge under either of these clauses. PhRMA, whose members engage in interstate commerce, has interests clearly within the scope of the Commerce Clause's protections. *See Oxford Assocs.*

*v. Waste Sys. Auth. of E. Montgomery County*, 271 F.3d 140, 146 (3d Cir.2001) ("The Supreme Court has explained that the Commerce Clause was not only designed to protect the states, but was also 'intended to benefit those [individuals] who ... are engaged in interstate commerce. The '[c]onstitutional protection against burdens is for [their] benefit).' " (quoting *Dennis v. Higgins*, 498 U.S. 439, 448–49, 111 S.Ct. 865, 112 L.Ed.2d 969 (1991)). Moreover, the First Circuit, in a case involving a similar Medicaid prior authorization program, has concluded that "an entity does not need prudential standing to invoke the protection of the Supremacy Clause." *PhRMA v. Concannon*, 249 F.3d 66, 73 (1st Cir.2001), *cert. granted*, 536 U.S. 956, 122 S.Ct. 2657, 153 L.Ed.2d 833 (U.S. June 28, 2002) (No. 01–188) (citing *St. Thomas–St. John Hotel & Tourism Ass'n v. Virgin Islands*, 218 F.3d 232, 241 (3d Cir.2000)). Accordingly, the Court finds no prudential standing obstacle to PhRMA's pursuit of its constitutional claims against DCH.

## III. Motion for Leave to File Second Amended Complaint

One additional preliminary matter, PhRMA's Motion for Leave to File Second Amended Complaint, remains to be decided before the Court can consider the merits of the pending claims. As noted earlier, PhRMA filed an amended complaint asserting claims against DCH analogous to the claims asserted against the Federal Defendants on August 27, 2002. PhRMA named DCH itself, not DCH's Director or another state official, as the defendant on its claims. On January 6, 2003, in response to an argument raised in DCH's cross-motion for summary judgment, PhRMA moved for leave to amend its complaint a second time in order to ensure compliance with the Eleventh Amendment. Specifically, PhRMA seeks

leave to name the Director of DCH, Janet Olszewski, rather than DCH itself, as the defendant on its Supremacy Clause and Commerce Clause claims.

A party seeking to amend its complaint a second time may do so only by leave of court or by written consent of the adverse party. *See* Fed.R.Civ.P. 15(a). Leave is to be freely given when justice so requires. *Id.* A trial court abuses its discretion in denying leave to amend unless the court provides a sufficiently compelling reason for denial, such as undue delay, undue prejudice to the other party, bad faith, dilatory motive, repeated failure to cure deficiencies by previous amendments, or futility of amendment. *See Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C.Cir.1996). An amendment is considered futile if the proposed complaint would not survive a motion to dismiss. *See James Madison Ltd. v. Ludwig*, 82 F.3d 1085, 1099 (D.C.Cir.1996). Here, DCH argues for futility on three grounds—that the Court lacks personal jurisdiction over Ms. Olszewski, that this is not the proper venue for adjudicating claims against Ms. Olszewski, and that PhRMA's claims are barred on the grounds of res judicata in light of a recent decision by the Michigan Court of Appeals.

The Court notes, as an initial matter, that PhRMA's present amended complaint indeed appears to be defective under the Eleventh Amendment because it purports to name a state agency rather than an official as the defendant. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) ("It is clear, of course, that in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by

the Eleventh Amendment."). PhRMA's proposed amendment naming Ms. Olszewski as the defendant on its Supremacy Clause claims would cure this defect under the doctrine of *Ex parte Young* and its progeny. *See Ex parte Young*, 209 U.S. 123, 159–60, 28 S.Ct. 441, 52 L.Ed. 714 (1908); *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 73, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996) ("[W]e often have found federal jurisdiction over a suit against a state official when that suit seeks only prospective injunctive relief in order to end a continuing violation of federal law." (citation omitted)). Notably, other courts have allowed similar amendments in order to ensure compliance with *Ex parte Young*. *See Brown v. Georgia Dep't of Revenue*, 881 F.2d 1018, 1022–23 (11th Cir. 1989); *CSX Transp., Inc. v. Georgia Pub. Serv. Comm'n*, 944 F.Supp. 1573, 1577 (N.D.Ga.1996).

The Court is not persuaded by DCH's arguments that the proposed amendment is futile due to lack of personal jurisdiction or want of venue. DCH voluntarily intervened in this case, thus becoming a full participant in this lawsuit and assuming the risk that the Court could order relief against it. *Schneider v. Dumbarton Developers, Inc.*, 767 F.2d 1007, 1017 (D.C.Cir.1985) ("When a party intervenes, it becomes a full participant in the lawsuit and is treated just as if it were an original party."); *see Secs. Indus. Ass'n v. Bd. of Governors of the Fed. Reserve Sys.*, 628 F.Supp. 1438, 1440 (D.D.C.1986) (where party had intervened to defend suit against Federal Reserve Board, it "assumed the risk that it would not prevail and that an order adverse to its interests would be entered"). Accordingly, DCH cannot now be heard to object that the Court lacks jurisdiction over it or that venue is improper. *See County Sec. Agency v. Ohio Dep't of Commerce*, 296 F.3d 477, 483 (6th Cir.2002) ("a motion to inter-

vene is fundamentally incompatible with an objection to personal jurisdiction"); *Secs. Indus. Ass'n*, 628 F.Supp. at 1440 (intervenor may not object to injunction issued against it on personal jurisdiction grounds). Moreover, DCH waived any objections to jurisdiction or venue with respect to claims against it or its officials because it never raised these objections in any of its earlier filings with this Court. *See Barnstead Broad. Corp. v. Offshore Broad. Corp.*, 869 F.Supp. 35, 38–39 (D.D.C.1994) (defendant waived objections on personal jurisdiction and venue grounds by not raising them in its opposition to a motion for a preliminary injunction); *George Washington Univ. v. Diad, Inc.*, Civ. A. No. 96–301, 1996 WL 470363, at *1 (D.D.C. Aug.9, 1996) (defendant waived objections to personal jurisdiction and venue by failing to raise them in five pleadings filed prior to motion to dismiss).

The fact that DCH, not Ms. Olszewski, is the nominal intervenor in this case does not somehow provide a basis upon which Ms. Olszewski (and by implication DCH) can avoid the Court's jurisdiction. There can be little doubt that Ms. Olszewski has had full awareness of these proceedings and, as DCH's Director, bears responsibility for DCH's continuing role in them. Moreover, although *Ex parte Young* draws a distinction between state officials and the state itself for subject matter jurisdiction purposes, DCH has not established that this distinction is relevant for purposes of analyzing personal jurisdiction or venue. *See Kentucky v. Graham*, 473 U.S. 159, 166, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) ("[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."). Accordingly, Ms. Olszewski is properly before the Court at this time.

██ DCH's res judicata argument also fails. By way of background, DCH's argu-

ment relates to litigation filed by PhRMA against DCH in Michigan state court in November 2001 seeking to enjoin implementation of the Initiative. The suit was brought primarily on state law grounds, but PhRMA also asserted a claim under the Commerce Clause. DCH removed the case to the United States District Court for the Western District of Michigan, which then remanded PhRMA's state law claims to state court and held PhRMA's Commerce Clause claim in abeyance. The state trial court issued a preliminary injunction against the Initiative, but that order was stayed by the Michigan Court of Appeals pending DCH's appeal. In the meantime, PhRMA sought and obtained from the federal court in the Western District of Michigan a dismissal without prejudice of PhRMA's Commerce Clause claim. On December 13, 2002, the Michigan Court of Appeals reversed the trial court's grant of a preliminary injunction, holding that PhRMA was not likely to prevail on the merits of its state law claims.

Based on this procedural history, DCH now argues that PhRMA is precluded from bringing claims against it. DCH points out that the Michigan courts have "adopted a broad application of res judicata that bars claims arising out of the same transaction that plaintiff could have brought but did not." *Bergeron v. Busch*, 228 Mich.App. 618, 579 N.W.2d 124, 126 (1998). Here, DCH contends, PhRMA could have brought its Supremacy Clause claims in Michigan state court and, in fact, did originally bring its Commerce Clause challenge in that forum. Accordingly, DCH argues, the decision by the Michigan Court of Appeals forecloses PhRMA's abil-

ity to bring federal claims against DCH in this Court.

The Court is not so persuaded. As an initial matter, although the decision by the Michigan Court of Appeals was issued prior to DCH's cross-motion for summary judgment and its reply thereto, DCH did not raise res judicata as a defense until it submitted its opposition to PhRMA's motion for leave to amend. At the February 5, 2003, summary judgment hearing, counsel for DCH essentially conceded that DCH's res judicata argument could have been raised earlier. *See* Tr. of Feb. 5, 2003, Hearing at 120. Thus there is at least some question as to whether a defense based on res judicata has been waived. *See Poulin v. Bowen*, 817 F.2d 865, 869 (D.C.Cir.1987) ("Res judicata must be pleaded as an affirmative defense. Failure to so plead constitutes a waiver of the defense.").[9]

In addition, the decision and order by the Michigan Court of Appeals was interlocutory in nature because the court considered PhRMA's claims only in the context of a motion for a preliminary injunction and concluded only that PhRMA was not likely to prevail on the merits. *PhRMA v. DCH*, 254 Mich.App. 397, 657 N.W.2d 162, 169 (2002). In fact, the court remanded the matter to the trial court for further proceedings, *id.*, and this Court has not been advised that any final determination on the merits has yet been made.[10] It is thus doubtful that the Michigan Court of Appeals' decision operates as res judicata upon this Court, despite the admittedly conclusive tone of the court's opinion. *See Univ. of Texas*

---

9. DCH has never filed an answer in this case, but it should have identified res judicata as a defense in its cross-motion for summary judgment.

10. Indeed, the interlocutory nature of the Michigan Court of Appeals' decision would perhaps even leave room for PhRMA to amend the complaint before the trial court to include the very claims that DCH asserts would be precluded here.

*v. Camenisch,* 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981) ("[F]indings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits."); *Cmty. Nutrition Inst. v. Block,* 749 F.2d 50, 56 (D.C.Cir.1984) ("[A] tentative assessment made to support the issuance of a preliminary injunction pending resolution of the issue ... is not even law of the case, much less res judicata in other litigation"); *Kuzinich v. County of Santa Clara,* 689 F.2d 1345, 1350–51 (9th Cir.1983) ("[I]ssues litigated in a preliminary injunction action are not res judicata and do not form a basis for collateral estoppel.").[11] Given the generous standard for permitting amendment of complaints under Fed. R.Civ.P. 15(a), the Court will not bar PhRMA from amending its complaint based upon a dubious res judicata argument that was not even raised in DCH's cross-motion for summary judgment.

## IV. Claims Against the Federal Defendants

With the preliminary issues resolved, the Court may proceed to consider the merits of the five claims asserted against the Federal Defendants. These claims are each brought under the APA, which requires that the Court "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2).

### A. "Illegal Formulary"

■ PhRMA and NUIC claim that DCH has created a "formulary" under 42 U.S.C. § 1396r–8(d)(4) but has failed to comply with the requirements specified in that provision. Section 1396r–8(d)(4) provides in relevant part:

A State may establish a formulary if the formulary meets the following requirements:

(A) The formulary is developed by a committee consisting of physicians, pharmacists, and other appropriate individuals appointed by the Governor of the State ....

(B) Except as provided in subparagraph (C), the formulary includes the covered outpatient drugs of any manufacturer which has entered into and complies with an agreement under subsection (a) of this section ....

(C) A covered outpatient drug may be excluded with respect to the treatment of a specific disease or condition for an identified population (if any) only if, based on the drug's labeling ... the excluded drug does not have a significant, clinically meaningful therapeutic advantage in terms of safety, effectiveness, or clinical outcome of such treatment for such population over other drugs included in the formulary and there is a written explanation (available to the public) of the basis for the exclusion.

(D) The State plan permits coverage of a drug excluded from the formulary ... pursuant to a prior authorization program that is consistent with paragraph (5).

---

11. *But see Hawksbill Sea Turtle v. FEMA,* 126 F.3d 461, 474 n. 11 (3d Cir.1997) ("[F]indings made in granting or denying preliminary injunctions can have preclusive effect if the circumstances make it likely that the findings are 'sufficiently firm' to persuade the court that there is no compelling reason for permitting them to be litigated again."); *Commodity Futures Trading Comm'n v. Bd. of Trade,* 701 F.2d 653, 657 (7th Cir.1983) (findings made in preliminary injunction decisions have preclusive effect "if the circumstances make it likely that the findings are accurate [and] reliable").

(E) The formulary meets such other requirements as the Secretary may impose in order to achieve program savings consistent with protecting the health of program beneficiaries.

A prior authorization program established by a State under paragraph (5) is not a formulary subject to the requirements of this paragraph.

42 U.S.C. § 1396r–8(d)(4). Because, under subpart (D) of this provision, any drug excluded from a formulary must be offered under a prior authorization program, PhRMA argues that a "formulary" by definition is a "list of drugs for which Medicaid reimbursement will automatically be provided without requiring physicians to undergo the cumbersome procedure of 'prior authorization.'" Mem. Supp. Pl.'s Mot. Prelim. Inj. at 1. Here, PhRMA contends, because DCH requires prior authorization for all drugs on the MPPL that are not "best in class" or priced favorably compared to the relevant "best in class" drugs, it has essentially created a formulary—a list of drugs subject to prior authorization. However, DCH has not, PhRMA argues, followed the rigorous requirements for formularies because, among other things, it excludes drugs from its formulary based upon price, rather than solely upon the absence of a "clinically meaningful therapeutic advantage," 42 U.S.C. § 1396r–8(d)(4)(C), and because DCH has not offered a written explanation for its exclusion of particular drugs, as required by subpart (C).

The Federal Defendants disagree. Pointing to the language in § 1396r–8(d)(4) stating that "[a] prior authorization program established by a State under paragraph (5) is not a formulary," they argue that DCH's plan creates a prior authorization program under paragraph (5), not a formulary, and that the plan was approved by the Secretary on that basis. Although every drug excluded from a formulary must be available through a prior authorization program, the Federal Defendants explain, not every list of drugs requiring prior authorization is necessarily a formulary. Moreover, they assert, a "formulary" and a "prior authorization" program are inherently different; "[w]hile the formulary provision is intended to allow states to categorically exclude drugs from coverage only for a therapeutic reason, prior authorization is to review any request for prescription drug coverage for any reason at all." Fed. Defs.' Mem. Supp. Mot. Summ. J. at 8.

In this instance, the Federal Defendants argue, DCH's program is a prior authorization program, nothing more. It does not purport to exclude drugs consistent with the "very specific requirements" for formularies in § 1396r–8(d)(4)(C). Fed. Defs.' Am. Opp. Mot. Prelim. Inj. at 21. Moreover, the Federal Defendants assert, DCH's program undoubtedly complies with the limited requirements for prior authorization programs contained at § 1396r–8(d)(5):

A State plan under this subchapter may require, as a condition of coverage or payment for a covered outpatient drug for which Federal financial participation is available in accordance with this section, with respect to drugs dispensed on or after July 1, 1991, the approval of the drug before its dispensing for any medically accepted indication ... only if the system providing for such approval—

(A) provides response by telephone or other telecommunication device within 24 hours of a request for prior authorization; and

(B) except with respect to the drugs on the list referred to in paragraph (2), provides for the dispensing of at least 72–hour supply of a covered outpatient

prescription drug in an emergency situation (as defined by the Secretary).

42 U.S.C. § 1396r–8(d)(5) (the "24/72 hour requirements").

DCH, for its part, provides yet a third gloss on how its program fits within the framework of § 1396r–8(d). In DCH's view, a "formulary" under § 1396r–8(d)(4) is not, as PhRMA contends, a list of drugs available under Medicaid without prior authorization; rather, it is "simply a list of drugs that a state agrees will be eligible for reimbursement under its Medicaid program." Intervenor–Def.'s Opp. Pl.'s Mot. Prelim. Inj. at 15. The MPPL, DCH asserts, is clearly a "formulary" in this sense—it lists all drugs eligible for reimbursement, and indeed, includes all drugs for sale within all of the relevant classes. Because no drug is excluded from the MPPL, DCH contends, the § 1396r–8(d)(5) requirements for excluding drugs do not apply. All DCH has done, it argues, is mark certain drugs on the MPPL with an asterisk to indicate that they are subject to a prior authorization requirement. This is fully permissible, DCH asserts, because § 1396r–8(d)(1) states that "[a] State may subject to prior authorization any covered outpatient drug," so long as the 24/72 hour requirements of § 1396r–8(d)(5) are satisfied.

In other words, DCH contends, the requirements of subsection (d)(4) "govern the ability of a State to exclude a drug from its list, and say nothing at all about the ability of the State to designate certain drugs that are kept on that list as being subject to prior authorization." Intervenor–Def.'s Mem. Opp. Pl.'s Mot. Summ. J. at 8 (emphasis omitted). Because DCH has retained all drugs on its formulary, has only designated certain of those drugs for prior authorization, and has met the minimal 24/72 hour requirements for prior authorization, its program is entirely proper.[12]

Each of these three competing interpretations of § 1396r–8(d) leaves something to be desired. Under PhRMA's interpretation, the existence of any prior authorization program necessarily signals the presence of a formulary. Thus, PhRMA would have the Court ignore the language in § 1396r–8(d)(4) stating unequivocally that "[a] prior authorization program established by a State under paragraph (5) is not a formulary."[13] The Federal Defendants' interpretation, on the other hand, fails to imbue the term "formulary" with any definite content. Although the Federal Defendants dispute that every list of drugs subject to prior authorization is necessarily a formulary, they fail to explain what a formulary actually is under their construct and thus when the requirements

---

**12.** DCH argues in the alternative that even if the formulary requirements in § 1396r–8(d)(4) do apply, its plan should stand because DCH has created a committee consistent with § 1396r–8(d)(4)(A), and that committee has subjected to prior authorization only drugs lacking in a significant therapeutic advantage. The Court need not address this argument because the Secretary approved DCH's program on the ground that it was a valid prior authorization program (as opposed to a formulary) and the Court does not find that the Secretary's approval on that basis was arbitrary, capricious, or otherwise not in accordance with law.

**13.** PhRMA attempts to address this shortcoming, contending that prior authorization programs are appropriate only when used in connection with other provisions in the Act that allow states to restrict use. PhRMA argues that prior authorization may be used, for example, in conjunction with drug use review programs, 42 U.S.C. § 1396r–8(g), or statutorily-authorized limits on refills, *id.* § 1396r–8(d)(6). However, PhRMA is unable to point to anything in the statute or the legislative history specifying that prior authorization is only permissible for these purposes.

of § 1396r–8(d)(4) would apply. DCH's interpretation goes further than that of the Federal Defendants, as DCH ascribes a specific definition for the term "formulary"; for DCH, a "formulary" is simply a list of covered drugs. But because a drug excluded from such a "formulary" would still have to be made available through a prior authorization program, designating a drug on a "formulary" as subject to prior authorization would have consequences similar to excluding the drug from the "formulary" altogether—although it would allow an end-run around the rigorous requirements for exclusion specified in § 1396r–8(d)(4).

In an effort to bolster their respective positions, PhRMA and DCH each direct the Court's attention to the legislative history behind § 1396r–8. Prior to 1990, states adopted restrictive drug lists for Medicaid without limitations. Responding to concerns that such restrictive drug lists were impacting beneficiaries' care, Congress in 1990 passed the Omnibus Budget Reconciliation Act of 1990 ("OBRA 90"), which curtailed use of such lists at the same time that it added the rebate provisions to the statute. *See* Mem. Supp. Pl.'s Mot. Prelim. Inj. at 16–17 & n. 9. OBRA 90 provided, in part, that

> any formulary or similar restriction ... on the coverage of covered outpatient drugs under the plan shall permit the coverage of outpatient drugs of any manufacturer which has entered into and complies with an agreement under section 1396r–8(a) of this title.

OBRA 90, Pub.L. No. 101–508, § 4401(a), 104 Stat. 1388 (1990) (codified at 42 U.S.C. § 1396a(a)(54) (repealed)). Thus, under OBRA 90, a "formulary" was required to include all drugs whose manufacturers had signed a rebate agreement with the Secretary.

Both PhRMA and DCH agree that OBRA 90 created a *quid pro quo* in which manufacturers agreed to provide rebates in return for a guarantee that their drugs would be available to Medicaid beneficiaries. *See* Mem. Supp. Pl.'s Mot. Prelim. Inj. at 17; Intervenor–Def.'s Opp. Pl.'s Mot. Prelim. Inj. at 18. In PhRMA's view, the specific benefit to the manufacturers from this *quid pro quo* was that their drugs would be available without limitation. *See* Mem. Supp. Pl.'s Mot. Prelim. Inj. at 17. But as DCH points out, OBRA 90 provided that "a State may subject to prior authorization any covered outpatient drug." OBRA 90 § 4401(a) (codified at 42 U.S.C. § 1396r–8(d)(1)(A)). Thus, in DCH's view, the benefit to manufacturers of the *quid pro quo* in OBRA 90 was to have their drug covered, not to have the drug automatically approved. *See* Intervenor–Def.'s Opp. Pl.'s Mot. Prelim. Inj. at 18. Likewise, DCH argues, the term "formulary" as contained in OBRA 90 describes a list of covered drugs, not a list of drugs automatically approved for reimbursement.

In 1993, the statutory language was amended to read as it does today. The language in § 1396a(a)(54), which had precluded exclusions from formularies, was eliminated, and § 1396r–8(d)(4), the provision allowing states to exclude drugs from formularies where the drugs lack a clinically meaningful therapeutic advantage, was added. PhRMA emphasizes that § 1396r–8(d)(4) not only required a state to comply with a rigorous process before excluding a drug from a formulary, but also created an important limitation on such exclusions—excluded drugs still had to be made available through a prior authorization program. Thus, in 1993 as in 1990, PhRMA argues, Congress was concerned about the use of restrictive formularies. DCH, in contrast, emphasizes that § 1396r–8(d)(4) sought to expand the

states' flexibility by allowing them again to exclude drugs from a formulary, a power that OBRA 90 had not granted. *See* H.R.Rep. No. 103–111, at 205 (1993) ("The purpose of this provision is to permit the States to reduce Medicaid spending on prescription drugs while not diminishing the medical care of Medicaid patients.").

The Court does not find the parties' discussion of the legislative history particularly edifying. DCH may have the better argument that the *quid pro quo* enacted in 1990 was that manufacturers would have their drugs listed on a formulary, but not necessarily automatically approved. Even so, this tells the Court little as to what Congress intended in 1993, when it indisputably overhauled the treatment of formularies under the Act and expressly conditioned the use of restrictive formularies on the availability of excluded drugs through a prior authorization program.

There is some appeal to PhRMA's argument that the high threshold for excluding drugs from formularies enacted in 1993 reflects the same concerns that in 1990 led Congress to eliminate restrictive formularies altogether, and thus DCH should not be allowed to bypass the formulary requirements. But in both 1990 and 1993, states were specifically permitted to require prior authorization and the only express (as opposed to implied) limitations on prior authorization in § 1396r–8(d) were the 24/72 hour requirements of § 1396r–8(d)(5).

Indeed, ultimately, it is not a consideration of the legislative history, but rather the absence of any express statutory limitation in § 1396r–8(d) on the use of prior authorization programs (other than the 24/72 hour requirements) that leads the Court to conclude that PhRMA's interpretation is untenable and that its "illegal formulary" claim must fail. It may seem somewhat incongruous that a state can subject a drug to prior authorization either by merely establishing a prior authorization program, or by following the additional, burdensome process specified in § 1396r–8(d)(4) to exclude a drug from a formulary. But the very first sentence under § 1396r–8(d)(1), which is entitled "Permissible restrictions," directs that "[a] State may subject to prior authorization any covered outpatient drug." 42 U.S.C. § 1396r–8(d)(1)(A). Moreover, the formulary requirements of § 1396r–8(d)(4) expressly command that "[a] prior authorization program established by a State under paragraph (5) is not a formulary subject to the requirements of this paragraph." These provisions are unequivocal in allowing the states broad room to establish prior authorization programs without creating *de facto* formularies. Indeed, § 1396r–8(d)(4) could not be clearer in specifying that states need not follow the procedures for excluding drugs from formularies in order to subject drugs to prior authorization.

The Court notes that its decision is generally in harmony with the position advanced both by the Secretary, who administers Medicaid,[14] and by the only federal appellate authority directly on point, the

---

**14.** The parties debate how much deference is owed to the Secretary's interpretation of the prior authorization and formulary provisions. The Court discusses deference under *Chevron, U.S.A., Inc. v. Natural Res. Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), and *Skidmore v. Swift & Co.,* 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944), with respect to the "best interests" claim in Section IV.C. below. It is not necessary to fix on a precise level of deference with respect to the Secretary's interpretation here because PhRMA's and NUIC's claims rely upon an interpretation that is not reasonable, and the only viable interpretation is the one consistent with the Secretary's position—that a prior authorization program need not comply with the requirements for a formulary.

decision of the Eleventh Circuit in *PhRMA v. Meadows*, 304 F.3d 1197 (11th Cir.2002), *petition for cert. filed*, 71 U.S.L.W. 3417 (U.S. Dec. 5, 2002) (No. 02–869). *Meadows* involved not an APA challenge to a decision by the Secretary, but a Supremacy Clause challenge to a Florida statute requiring physicians to obtain approval for the use by a Medicaid recipient of drugs that are not on Florida's preferred drug list. As in the instant case, drug manufacturers who paid a supplemental rebate were guaranteed to have their products included on the preferred drug list. *Id.* at 1199. The court held that because the Florida law "merely condition[ed] coverage for non-preferred drugs on whether the prescribing physician has followed the prior authorization procedure," and did not "exclude coverage for any Medicaid eligible drugs, which is the literal effect of a § 1396r–8(d)(4) formulary," the law was a valid prior authorization program. *Id.* at 1211 (emphasis in original). This difference between "conditioning" coverage and "excluding" coverage, the court found, distinguished a prior authorization program under § 1396r–8(d)(5) from a formulary under § 1396r–8(d)(4). *Id.* at 1201–02. Moreover, the court concluded that the legality of Florida's program under § 1396r–8(d) was sufficiently clear that recourse to the legislative history of the federal statute was unnecessary. *Id.* at 1210.

PhRMA challenges the *Meadows* decision primarily on the same basis that it challenges DCH's position in this litigation—*i.e.,* that "[t]here is no difference between excluding a drug from coverage unless prior approval is given and conditioning coverage on that same prior approval." Pl.'s Notice Supp. Auth. (Sept. 12, 2002) at 4. In this regard, PhRMA directs the Court's attention to the Eleventh Circuit's discussion of the require-

ment in § 1396r–8(d)(4) that a drug excluded from a formulary still must be "cover[e]d ... pursuant to a prior authorization program that is consistent with paragraph (5)." The Eleventh Circuit "construe[d] this requirement to mean that a state must consider coverage for an excluded drug on a case-by-case basis." *Meadows,* 304 F.3d at 1208. In a footnote, the court suggested that the type of prior authorization referenced in § 1396r–8(d)(4) concerns "exceptions to [formulary exclusion], presumably because of medical factors specific to [the] patient," whereas "a prior authorization program under subsections (d)(1)(A), (d)(5), such as that provided in the Florida law, can be used to inform doctors about the availability of drugs with comparable therapeutic properties that are also more cost-effective for the state." *Id.* at 1208 n. 9. PhRMA disputes this interpretation, noting that it is "nowhere found in the statute or its legislative history." Pl.'s Notice Supp. Auth. (Sept. 12, 2002) at 3.

The Court agrees with PhRMA that the Eleventh's Circuit's interpretation of the prior authorization requirement referenced in § 1396r–8(d)(4) is not based in the statutory text, and the Court does not adopt that interpretation here. The Court does not need to do so, however, in order to reach the same ultimate conclusion as the Eleventh Circuit did—that a state's authority to create a prior authorization program under § 1396r–8(d)(1)(A) and (d)(5) extends to the power to subject drugs to prior authorization where the manufacturer has not paid a requested rebate. As noted above, this conclusion is compelled by Congress's explicit directives that "[a] prior authorization program ... is not a formulary," § 1396r–8(d)(4), and that "[a] State may subject to prior authorization any covered outpatient drug," § 1396r–

8(d)(1)(A).[15]

Although, as PhRMA argues, there may be little difference between "conditioning" coverage on prior authorization and "excluding" a drug from coverage unless prior approval is given, there is still some difference: in the first scenario, the manufacturer's drug is on the state's list of covered drugs, but with an asterisk indicating that prior authorization is necessary; in the second scenario, the drug is not on the list at all. It is hard to fathom that, from a marketing perspective, a drug manufacturer would be indifferent between these two outcomes. In any event, the Court is bound to follow Congress's intent, and the intent here is clearly inconsistent with PhRMA's and NUIC's narrow understanding of the states' prior authorization powers. Accordingly, the Court rejects the claim of PhRMA and NUIC that the Secretary acted arbitrarily, capriciously, or otherwise not in accordance with law in approving DCH's prior authorization program as described in SPA 01–015.

## B. Supplemental Rebate

 The second claim in this litigation, asserted by PhRMA alone, is that the Secretary improperly approved DCH's supplemental rebate requirement. The operative statutory provision here is 42 U.S.C. § 1396r–8(a)(1):

(a) Requirement for rebate agreement

(1) In general. In order for payment to be available under section 1396b(a) of this title for covered outpatient drugs of a manufacturer, the manufacturer must have entered into and have in effect a rebate agreement described in subsection (b) of this section with the Secre-

tary, on behalf of States (except that, the Secretary may authorize a State to enter directly into agreements with a manufacturer), and must meet the requirements of paragraph (5) (with respect to drugs purchased by a covered entity on or after the first day of the first month that begins after November 4, 1992) and paragraph (6). . . .

Under PhRMA's interpretation, this paragraph—and in particular the term "except that"—"contemplates separate state agreements as **alternatives to**, rather than in **addition to**, the Secretary's agreement." Mem. Supp. Pl.'s Mot. Prelim. Inj. at 23. The provision, PhRMA argues, thus provides flexibility for states to negotiate rebates with manufacturers that may differ from the Secretary's agreement on a drug-by-drug basis, establishing greater rebates for some drugs but lower rebates on others, so long as the aggregate rebated amount at least equals that obtained by the Secretary. What the provision does not allow, PhRMA contends, is for a state to use the rebate amount negotiated by the Secretary as a "floor" from which to negotiate higher, supplemental rebates. PhRMA maintains that DCH's program here violates § 1396r–8(a)(1) because DCH presumes that the Secretary's rebate is already in place and then seeks to negotiate an even greater additional rebate.

PhRMA's argument is not convincing. Any negotiation between a state and a manufacturer operates against a backdrop where there is already an agreement between the Secretary and the manufacturer in place; both parties know that if their negotiations fail, the rebate level in the Secretary's agreement will apply. This

---

**15.** PhRMA also attempts to distinguish *Meadows* on the grounds that, in that case, approval of the prescribing doctor's first-choice drug is guaranteed in 100 percent of all cases. But even if this were a relevant distinction in theory, as discussed in Section IV.C. *infra,* the Secretary properly determined that drugs will not be denied to a beneficiary under DCH's program where a physician states that there is a medical necessity.

default rebate level is thus necessarily a "floor" that factors into negotiations between the state and the manufacturer, even if only implicitly. DCH's program is not unlawful because it acknowledges the reality that a floor exists.

Moreover, contrary to PhRMA's suggestion, the statutory text does not require parties negotiating state agreements to target the level of the Secretary's rebate in the aggregate. Indeed, § 1396r–8(a)(4) provides that state agreements may contain rebates "that are at least as large as the rebates otherwise required under this section." Thus, Congress clearly envisioned that state rebate agreements could build upon the rebate level achieved by the Secretary. An agreement including state rebate levels greater than the default national rebate level is therefore by no means inconsistent with the statute.

To the extent that PhRMA's argument boils down to the assertion that the term "except that" requires that there be only a single document comprising the rebate agreement with respect to each state— either a written agreement between a manufacturer and a State or a written agreement between a manufacturer and the Secretary—this proposition unreasonably elevates form over substance. The Secretary's approval of DCH's Supplemental Drug Rebate Agreement is not arbitrary and capricious merely because, instead of restating all of the terms from existing agreements between the manufac-

turers and the Secretary, the Supplemental Drug Rebate Agreement simply references and then expands upon the existing agreements with the Secretary.[16] Accordingly, the Court rejects PhRMA's supplemental rebate claim.

## C. "Best Interests"

The third statutory provision at issue in this litigation is 42 U.S.C. § 1396a(a)(19), which requires that a State plan "provide such safeguards as may be necessary to assure that . . . care and services will be provided, in a manner consistent with simplicity of administration and the best interests of the recipients." NUIC[17] asserts that this "best interests" requirement is violated by the portion of the Initiative requiring that, as a condition to ensuring that their drugs can be prescribed for Medicaid recipients without prior authorization, drug manufacturers agree to provide rebates with respect to two non-Medicaid programs run by Michigan. NUIC has submitted several extra-record affidavits from persons in Michigan purporting to have suffered harm as a result of denial or delayed approval of medications under the prior authorization program. NUIC also has submitted a study by an independent organization postulating that the prior authorization program has had adverse effects on the health of some Medicaid beneficiaries. NUIC appears to argue that to subject Medicaid

---

**16.** The Court need not reach the question as to what level of deference should apply to the Secretary's interpretation of § 1396r–8(a)(1) because it is evident that the Secretary's interpretation, which permits supplemental rebates, is the only permissible one. PhRMA has not, in any event, identified persuasive evidence that the Secretary has previously taken a different position; even if the Secretary had, moreover, this would not necessarily deprive the Secretary's current position of entitlement to at least some deference under

*Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944). *See generally* discussion at Section IV.C. *infra.*

**17.** Because it is doubtful that PhRMA has prudential standing to raise a "best interests" claim, the Court in this Section will distinguish between arguments raised by NUIC (which the Court has concluded does have prudential standing) and arguments raised by PhRMA.

beneficiaries to the potential harms posed by prior authorization where the projected savings will occur only in the non-Medicaid realm is fundamentally inconsistent with the "best interests" of Medicaid recipients.

The Secretary adopts a different interpretation of the interplay between § 1396a(a)(19) and the prior authorization provisions in § 1396r-8(d). As set forth in the September 18, 2002, SMD letter, the Secretary believes that the Medicaid statute does not preclude states from establishing "a prior authorization program for Medicaid covered drugs to secure drug benefits, rebates or discounts for non-Medicaid populations." *See* Fed. Def.'s Notice Supp. Auth. (Sept. 27, 2002), Ex. A at 3. However, the Secretary maintains, such a program must be approved by CMS through its process for reviewing amendments to state Medicaid plans, and in order to secure approval a state must "demonstrate through appropriate evidence that the prior authorization program will further the goals and objectives of the Medicaid program." *Id.* The SMD Letter further explains:

> A State could make such a demonstration by submitting appropriate evidence that its prior authorization program is designed to increase the efficiency and economy of the Medicaid program. A State could demonstrate that its prior authorization requirement furthers Medicaid goals and objectives by submitting appropriate evidence that the requirement sufficiently benefits the Medicaid population as a whole by making available to financially needy individuals medically necessary prescription drugs, thereby improving their heath status

and making it less likely that they will become Medicaid eligible.

*Id.*

As an initial response, NUIC argues that the Secretary's interpretation is not entitled to deference under *Chevron, U.S.A., Inc. v. Natural Res. Defense Council, Inc.,* 467 U.S. 837, 842–45, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)—the seminal case holding that, in certain circumstances, a court must accept an agency's reasonable interpretation of a statute. To begin with, NUIC asserts, the Secretary's interpretation is contradicted by the statutory language, which refers only to the "best interests" of Medicaid recipients and thus precludes the Secretary from "engag[ing] in a standardless policy determination as to what it considers desirable." Pl.-Intervenors' Cons.Supp. Mem. Supp. Mot. Prelim. Inj. & Mem. Supp. Mot. Summ. J. at 8; *see Chevron,* 467 U.S. at 843 n. 9, 104 S.Ct. 2778 (courts "must reject administrative constructions which are contrary to clear congressional intent"). In addition, the Secretary's interpretation, NUIC claims, is at best an informal decision not made in accordance with the rigors of the APA and thus undeserving of *Chevron* deference. *See, e.g., Reno v. Koray,* 515 U.S. 50, 61, 115 S.Ct. 2021, 132 L.Ed.2d 46 (1995) (agency guidance that was "not subject to the rigors of the [APA], including public notice and comment," is entitled only to "some deference" (internal quotation marks omitted)). Finally, NUIC argues, the Secretary's interpretation has been formulated in the shadow of impending litigation—here and in the Supreme Court [18]—thus depriving

---

18. The Supreme Court litigation involves PhRMA's appeal from the First Circuit's decision in *PhRMA v. Concannon,* 249 F.3d 66 (1st Cir.2001), *cert. granted,* 536 U.S. 956, 122 S.Ct. 2657, 153 L.Ed.2d 833 (U.S. June 28, 2002) (No. 01–188). In that case, the First

Circuit rejected PhRMA's facial challenge under the Supremacy Clause to a Maine program that subjects manufacturers' drugs to Medicaid prior authorization unless the manufacturers provide rebates in a state prescription drug program. *Id.* at 71–72, 78. The

the interpretation of whatever deference to which it would otherwise be entitled. *See Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 213, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988) ("Deference to what appears to be nothing more than an agency's convenient litigating position would be entirely inappropriate.").

There is some merit to NUIC's position. The Supreme Court explained in *United States v. Mead Corp.,* 533 U.S. 218, 226–27, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001), that *Chevron* deference is appropriate only "when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." Here, the Federal Defendants do not defend the SMD Letter on the ground that it constitutes an exercise of the Secretary's rulemaking power, and indeed, the informal nature of the Letter stands in marked contrast to the classic *Chevron* scenario of notice-and-comment rulemaking. As to the formality of its development, the SMD Letter is perhaps more akin to " 'interpretations contained in policy statements, agency manuals, and enforcement guidelines,' " which are " 'beyond the *Chevron* pale.' " *Id.* at 234, 121 S.Ct. 2164 (quoting *Christensen v. Harris County,* 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000)).

On the other hand, the Supreme Court in *Mead* clarified that the absence of "administrative formality" is not dispositive on the question of *Chevron* deference. 533 U.S. at 231, 121 S.Ct. 2164. Rather, courts may consider "the interstitial nature of the legal question, the related expertise of the Agency, the importance of the question to administration of the statute, the complexity of that administration, and the careful consideration the Agency has given the question over a long period of time." *Barnhart v. Walton,* 535 U.S. 212, 122 S.Ct. 1265, 1273, 152 L.Ed.2d 330 (2002). Here, Congress has assigned the Secretary the duty of reviewing and approving state Medicaid plans. *See* 42 U.S.C. § 1396. In carrying out that duty, the Secretary must necessarily interpret the statutory language concerning the requirements for state Medicaid plans contained in § 1396a and elsewhere. Even if the SMD Letter itself does not "carry the force of law," *Mead,* 533 U.S. at 221, 121 S.Ct. 2164, the particular applications of the interpretation contained therein—such as the Secretary's approval of DCH's proposed amendment here—perhaps do. Moreover, there is no question that Medicaid is a "complex and highly technical regulatory program" that the Secretary has "significant expertise" in administering. *See Thomas Jefferson Univ. v. Shalala,*

---

First Circuit explained that it was "not convinced that the Medicaid statute is concerned with the motivation behind imposing prior authorization as long as the [24/72 hour requirements] are satisfied." *Id.* at 76. But even if motivation were relevant, the court concluded, Maine's program passes muster because it serves purposes related to Medicaid—namely, it provides medical services for persons unable to afford them and, in doing so, possibly enables such persons to avoid diverting to Medicaid due to diminishing health. *Id.*

The United States filed an amicus brief in *Concannon* on September 20, 2002—two days after the SMD Letter was issued. In its amicus brief, the United States advanced the interpretation contained in the SMD Letter, and argued for reversal of the Maine program on the ground that it "is not tailored to any Medicaid-related purpose of ensuring low-income individuals' accessibility to prescription drugs" because it "is open to all Maine residents, regardless of financial or medical need." Brief for the United States as Amicus Curiae Supporting Reversal, 2002 WL 31156279, at *21, *PhRMA v. Concannon,* No. 01–188 (U.S.).

512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994) (quoting *Pauley v. BethEnergy Mines, Inc.,* 501 U.S. 680, 697, 111 S.Ct. 2524, 115 L.Ed.2d 604 (1991)). Furthermore, the Supreme Court has repeatedly rejected the contention that an interpretation advanced by the agency against the background of litigation must be disregarded. *See Barnhart,* 535 U.S. at ——, 122 S.Ct. at 1271 (citing cases).

Setting aside the question of *Chevron* deference, it is clear that the Secretary's interpretation of § 1396a(a)(19) and its relationship to the prior authorization provisions would be entitled to at least some deference consistent with the Supreme Court's decision in *Skidmore v. Swift & Co.,* 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944). As the Supreme Court in *Mead* explained:

> [W]hether or not they enjoy any express delegation of authority on a particular question, agencies charged with applying a statute necessarily make all sorts of interpretive choices, and while not all of those choices bind judges to follow them, they certainly may influence courts facing questions the agencies have already answered. [T]he well-reasoned views of the agencies implementing a statute constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance, and [w]e have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer.... The fair measure of deference to an agency administering its own statute has been un-

derstood to vary with circumstances, and courts have looked to the degree of the agency's care, its consistency, formality, and relative expertness, and to the persuasiveness of the agency's position.... Justice Jackson summed things up in *Skidmore v. Swift & Co.:*

> The weight [accorded to an administrative] judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control. 323 U.S. at 140, 65 S.Ct. 161.

*Mead,* 533 U.S. at 227–28, 121 S.Ct. 2164 (internal citations, quotation marks, and footnotes omitted).

The Secretary's interpretation here has persuasive force based upon the Secretary's substantial expertise in administering the Medicaid statute. *See Wisconsin Dep't of Health & Family Servs. v. Blumer,* 534 U.S. 473, 479, 122 S.Ct. 962, 976, 151 L.Ed.2d 935 (2002) (Secretary's interpretation of Medicaid statute set forth in letters and proposed rule "warrants respectful consideration"); *Thomas Jefferson Univ.,* 512 U.S. at 512, 114 S.Ct. 2381. And although the position advanced by the Secretary in the SMD Letter is not longstanding, it by no means represents a reversal of an earlier established agency position; instead, it represents a timely and considered response prompted by innovations from Michigan and other states attempting to reduce health care expenditures amidst difficult fiscal circumstances.[19]

---

**19.** PhRMA directs the Court's attention to a 1998 letter to the Minnesota Department of Human Services from the Technical Director in CMS's Family and Children's Health Programs Group and a 2001 letter to the California Department of Health Services from an

Associate Regional Administrator of Medicaid. *See* Reply Mem. Further Supp. Pl.'s Mot. Prelim. Inj., Exs. 1 & 2. PhRMA argues that these documents indicate that the Secretary has previously taken the position that Medic-

Most importantly, the Secretary's position is eminently reasonable. Standing alone, the term "best interests of the recipients" could be understood to refer either to the best interests of discrete individuals who are current Medicaid beneficiaries, as NUIC suggests, or to the best interests of Medicaid beneficiaries on a macro level, and thus, by implication, to the best interests of a state Medicaid program, which must provide care and services to eligible persons on a going-forward basis. The plausibility of the former construction is undermined, however, by the reality that a state developing a Medicaid plan, and in the course thereof deciding how to allocate the limited pool of resources that may be available for its Medicaid program, cannot as a practical matter ensure that its state plan will advance the best interests of each and every individual recipient. *See Alexander v. Choate,* 469 U.S. 287, 303, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985) ("Medicaid programs do not guarantee that each recipient will receive that level of health care precisely tailored to his or her particular needs.... [The] package of services [offered] has the general aim of assuring that individuals will receive necessary medical care, but the benefit provided remains the individual services offered—not 'adequate health care.' "); *Greenstein v. Bane,* 833 F.Supp. 1054, 1072 n. 14 (S.D.N.Y.1993) ("The best interests provision refers to 'recipients' in the aggre-

gate."); *see also Bumpus v. Clark,* 681 F.2d 679, 684 (9th Cir.1982), *op. withdrawn as moot* 702 F.2d 826 (1983) ("Section 1396a(a)(19) must be considered in light of the legislative scheme as a whole. The Medicaid program is not intended to meet all the medical needs of recipients.") Thus the possibility that certain Medicaid beneficiaries could fare less well as a result of an amendment to a state Medicaid plan does not necessarily mean that a state has failed to "safeguard[ ] ... the best interests of [Medicaid] recipients" provided that, as the Secretary has concluded here, the amendment inures to the benefit of the Medicaid population or the Medicaid program as a whole.

This interpretation is bolstered by a juxtaposition of two parts of the Medicaid statute that are at issue here - § 1396a(a)(19), which contains the "best interests" requirement, and § 1396r–8(d)(1), which allows states to "subject to prior authorization any covered outpatient drug." Assuming, as NUIC argues, that a prior authorization program inevitably harms some Medicaid recipients, Congress certainly would not in § 1396a(a)(19) have required the states to ensure that no Medicaid recipient is harmed by a state Medicaid plan yet at the same time have allowed states in § 1396r–8(d) to implement prior authorization programs. *See FDA v. Brown & Williamson Tobacco Corp.,* 529

---

aid may not be leveraged for the benefit of non-Medicaid populations.

The 1998 letter to Minnesota, however, indicated only that states may not "require manufacturers to participate in a state-funded program as a condition for participating in the Medicaid drug rebate program." *See* Reply Mem. Further Supp. Pl.'s Mot. Prelim. Inj., Ex. 1. It did not specify that use of Medicaid prior authorization (which assumes manufacturer participation in the Medicaid drug rebate program) in connection with non-Medicaid programs was impermissible. Likewise, the 2001 letter to California did not

address state use of the prior authorization requirement in connection with non-Medicaid programs, but concerned "leverag[ing]" more generally. *See* Reply Mem. Further Supp. Pl.'s Mot. Prelim. Inj., Ex. 2.

In short, these letters written by the Secretary's agents, which have only limited relevance to the issue here—the interaction between § 1396a(a)(19) and § 1396r–8(d)—do little to undermine the persuasiveness of, and ultimately the deference owed to, the position of the Secretary as adopted in the SMD letter and applied to Michigan's non-Medicaid programs.

U.S. 120, 133, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000) ("A court must . . . interpret the statute 'as a symmetrical and coherent regulatory scheme,' and 'fit, if possible, all parts into an harmonious whole.'" (citations omitted)). The Secretary's broad interpretation of "best interests" eliminates any inconsistency between the provisions: a prior authorization program can be acceptable under (a)(19) even if in particular cases "individual Medicaid beneficiaries . . . may . . . experience[ ] problems in obtaining their first-choice drugs," so long as the prior authorization safeguards the "best interests of the Medicaid program as a whole." *See* Fed. Defs.' Opp. Pl's. Supp. Mot. Prelim. Inj. at 6.[20]

Overall, the Secretary's position is not only permissible but highly reasonable—much more so than the cramped, if not impractical and problematic, reading offered by NUIC. Moreover, given the Secretary's role in administering the Medicaid statute, the Secretary's interpretation is especially persuasive under *Skidmore,* if not binding under *Chevron. See Mead,* 533 U.S. at 226–28, 121 S.Ct. 2164.[21]

 Having adopted the Secretary's interpretation of the interaction between § 1396a(a)(19) and the prior authorization provisions of § 1396r–8(d), the Court must proceed to assess whether the Secretary's action in approving SPA 02–019 was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). SPA 02–019 requires that drug manufacturers offer rebates in two Michigan non-Medicaid programs, the Elderly Prescription Insurance Coverage program ("EPIC ") and the Maternity Outpatient Medical Service ("MOMS"), in order to ensure that their products are not subject to prior authorization in the Michigan Medicaid program.

The EPIC program currently provides prescription coverage to approximately 15,000 low-income seniors age 65 and over whose gross household income is less than 200 percent of the federal poverty level, who have no other prescription drug coverage, and who do not receive full Medicaid benefits. SAR at 010. In seeking approval from CMS with respect to the EPIC program, DCH argued that the "establishment and maintenance of pharmacy coverage for indigent persons whose income and/or assets are too high to qualify for Medicaid would divert costs by preventing

**20.** There are other ways to reconcile § 1396a(a)(19) and the prior authorization provisions of § 1396r–8(d) as well. One would be to reject the premise that prior authorization is per se harmful to beneficiaries and to conclude instead that Congress intended that only those prior authorization programs that do not pose risk of harm should be implemented. Indeed, such an interpretation dovetails with PhRMA's interpretation of § 1396r–8(d)—that prior authorization is only allowed where there has been compliance with the formulary requirements of § 1396r–8(d)(4) and thus where the State has concluded that the drug subject to prior authorization does not have a significant, clinically meaningful therapeutic advantage.

**21.** PhRMA argues that if the interpretation in the SMD Letter is correct, states could use the

threat of Medicaid prior authorization to compel drug manufacturers to provide funding for public housing, job training programs, and other projects that might conceivably reduce poverty and hence limit the number of people eligible for Medicaid. But the SMD Letter does not address the scenarios PhRMA envisions, nor has the Secretary advised the Court of his considered position on whether the Medicaid prior authorization requirement can be leveraged to obtain funding for state programs outside the health care arena. Given that DCH's Initiative concerns state-funded health care programs only, the Court need not consider whether the use of Medicaid prior authorization in connection with other types of social programs might be inconsistent with the Medicaid statute.

the use of more intensive services, erosion of personal resources to pay for these services and subsequent enrollment into the state's Medicaid program." *Id.* at 022. DCH also submitted an analysis to CMS estimating that its EPIC program would prevent 3,016 individuals from diverting to Medicaid, and that the resulting annual savings to Michigan's Medicaid program would be $ 44 million. *Id.* at 026.

The MOMS program provides prenatal services to women below 185 percent of the federal poverty level, adolescents 17 years old and younger, Medicaid Emergency Services Only beneficiaries, and incarcerated beneficiaries. *Id.* at 011. DCH argued to CMS that the MOMS program helps achieve Medicaid savings in two ways: "[b]y providing services to persons that might be Medicaid eligible but don't want to involve their parents in the eligibility determination process"; and "[b]y providing prenatal care to the mothers who are not and will not become Medicaid eligible but whose children will be Medicaid eligible and at higher risk for neonatal intensive care." *Id.* at 035. DCH submitted an analysis to CMS showing that of the 18,141 enrollees in MOMS, 12,262 had already converted to Medicaid. *Id.* at 038. DCH estimated that 592 of the remaining participants were teenage mothers who would divert to Medicaid in the absence of the MOMS program, at an aggregate annual cost to the Medicaid program of $685,510. *Id.* at 036. DCH also determined that 5,287 MOMS participants would remain ineligible for Medicaid if MOMS were eliminated. However, these persons would not receive prenatal care, thus resulting in an estimated 169 births of Medicaid-eligible children requiring neonatal intensive care. *Id.* at 036–37. The cost to Medicaid of providing these neonatal services, DCH estimated, would be $4,646,002. *Id.*

With respect to both the EPIC and MOMS programs, DCH argued to CMS that a non-Medicaid linkage "further[s] the goals and objectives of the Medicaid program" in two respects: "first, it provides medically necessary prescription drugs to financially needy individuals who, but for the ... state programs, would most likely begin to draw on Medicaid resources; and second, it increases the efficiency and economy of the Medicaid program." *Id.* at 011. In addition to the savings estimates concerning the specifics of EPIC and MOMS, DCH submitted to CMS a list of publications supporting its analysis. *Id.* at 039–43.

On December 5, 2002, CMS, on behalf of the Secretary, issued to DCH a four-page letter approving SPA 02–019 on the grounds that it would "further the goals and objectives of the Medicaid program as a whole." *Id.* at 714. CMS reviewed the evidence proffered by DCH in support of the proposed amendment, and found "reasonable" DCH's conclusion that the EPIC and MOMS programs assist the EPIC and MOMS populations in maintaining or improving their health status. *Id.* at 713. CMS accepted DCH's representation that "cuts to or elimination of these State-funded programs will be required in the absence of cost-savings achieved through the rebate program." *Id.* at 713–14. These cuts, CMS noted, "will necessarily result in some individuals enrolling in Medicaid, and for others, lead to a decline in their health status and resources that will result in Medicaid eligibility or increased Medicaid expenditures." *Id.* at 714. Such an outcome would "strain already scare Medicaid resources in a time of State budgetary shortfalls." *Id.* Accordingly, CMS found that "[i]n light of the close relationship of the non-Medicaid populations in the EPIC and MOMS programs to the Medicaid population in Michigan, ... the evidence Michigan presented, taken as a whole, sup-

ports Michigan's conclusion that continuing prescription drug coverage under these two programs provides a benefit to the Medicaid population as a whole." *Id.*

CMS also concluded that the prior authorization procedure proposed by DCH would not impose an "undue burden on Medicaid recipients." *Id.* CMS noted that DCH had confirmed that "even for drugs for which prior authorization is required, reimbursement will be authorized upon the prescribing physician's assurance of the drugs' medical necessity." *Id.* Thus CMS found that "any incremental burdens resulting from the imposition of a prior authorization requirement ... will [not] likely harm Medicaid recipients." *Id.* CMS also observed that DCH's program could yield "broader benefits because, by using the same preferred drug list and approval process for these two State-funded programs and the Medicaid program, the State achieves administrative efficiencies and economies of scale that directly benefit the Medicaid population and could result in lower Medicaid outlays as some physicians may prescribe less-expensive, therapeutically equivalent drugs to their Medicaid patients." *Id.*

NUIC challenges CMS's approval on several grounds. First, NUIC attacks the thoroughness of CMS's review, arguing that CMS simply accepted DCH's evidence at face value, and failed to engage in any independent investigation or fact-finding. In addition, NUIC asserts, CMS specifically failed to consider harm to beneficiaries from prior authorization and failed to consider ways in which imposing a prior authorization requirement could increase Medicaid costs.

These challenges are without merit. The administrative record reflects substantial consultation between CMS and DCH during the course of CMS's two-and-a-half-month consideration of the proposed amendment, and repeated requests by CMS for additional supporting information. *See, e.g.,* SAR at 6, 272, 274, 283, 686, 686 (modifications or additional information provided by DCH in response to CMS requests). Such extensive interaction is indicative of a careful, not a superficial, assessment by CMS. The record also reflects that CMS reviewed the information provided and digested it for ranking CMS officials, including the Director of CMS. *See id.* at 688. Moreover, the December 5, 2002, approval letter itself, in which CMS found "reasonable" DCH's analyses and highlighted the aspects of DCH's submission that motivated CMS's approval, evidences CMS's thoughtful evaluation of the proposed amendment. Contrary to NUIC's assertion, neither the APA nor the Medicaid statute requires that CMS conduct an independent factual investigation or empirical research before approving a State Medicaid plan where the State itself has provided considerable supporting data. *See* 42 C.F.R. § 430.10 ("The State plan contains all information necessary for CMS to determine whether the plan can be approved to serve as a basis for Federal financial participation (FFP) in the State program."); *see also Union of Concerned Scientists v. Atomic Energy Comm'n,* 499 F.2d 1069, 1078 (D.C.Cir.1974) (rejecting concern over "self-serving" submission where the federal agency had scrutinized the submission); *Iowa Citizens for Envtl. Quality v. Volpe,* 487 F.2d 849, 854 (8th Cir.1973) (agency action proper where Secretary reviewed, modified, and adopted the state's work).[22]

---

**22.** PhRMA cites cases under the National Environmental Policy Act in support of the proposition that an agency must conduct its own analysis. *See, e.g., Greene County Planning Board v. Federal Power Comm'n,* 455 F.2d 412, 420–22 (2d Cir.1972) (invalidating action

Moreover, NUIC is incorrect in asserting that CMS failed to consider the potential harm to beneficiaries from prior authorization and increased Medicaid costs resulting therefrom. The December 5, 2002, approval letter specifically addresses concerns with potential harms from prior authorization, which were brought to CMS's attention in connection with CMS's consideration of the Medicaid-only portions of the Initiative in SPA 01–015. *See, e.g,* AR at 209–20, 251–52, 280–81, 289–90, 299–300, 351–52. As noted above, CMS concluded that "any incremental burden resulting from the imposition of a prior authorization requirement . . . will [not] likely harm Medicaid recipients." SAR at 714. This conclusion is not arbitrary and capricious, as DCH's statements in the supplementary administrative record confirm that a drug will be reimbursed as long as the prescribing physician assures that there is a medical necessity for the drug. *See id.* at 311–12. Specifically, according to the Deputy Director of DCH, David Viele, prior authorization will be granted by DCH's pharmacy benefits manager at the time of the initial request if the physician indicates a medical necessity for any of the following reasons: (1) the beneficiary requires the requested drug due to a specific medical condition or necessity, such as drug allergy; (2) the beneficiary has already used the requested drug for several months and switching drugs would be medically inadvisable; (3) the beneficiary has already tried drugs available in the therapeutic class and had treatment failure or side effects; or (4) the requested drug works better in combination with other medications that the beneficiary uses. *Id.* at 311. If the prescribing physician's request does not fall into one of these categories, the call is immediately forwarded to a pharmacist who may approve the request or instead deny the request and inform the physician of the right to appeal to a DCH physician. *Id.* at 311–12. When a request cannot be immediately resolved, the prescribing physician is authorized to prescribe a 72–hour supply of the drug without prior authorization. *Id.* On appeal, the prescribing physician will continue to have the final say on whether the drug will be approved, as long as he or she follows the prior authorization process and attests to medical necessity. *Id.*

Although PhRMA argues that even on appeal a prescribing physician must demonstrate that the drug sought falls within one of the four categories noted above, the authority PhRMA relies upon—the Viele Declaration—does not support its position. *See* Pl.'s Statement of Material Facts ¶ 15 (citing SAR at 311). Rather, Mr. Viele states that "[t]he prior authorization process makes available for reimbursement any drug the prescribing doctor states is medically necessary for the patient." SAR at 311.[23] The Secretary therefore properly noted that "Michigan has confirmed . . . that even for drugs for which prior authorization is required, reimbursement will be

---

where agency "substituted the statement of [the regulated entity] for its own" because of the "potential, if not likelihood, that the applicant's statements will be based on self-serving assumptions"). But even if these cases were good law in this Circuit, *see Conservation Soc'y of S. Vt., Inc. v. Sec'y of Transp.,* 508 F.2d 927, 929 n. 3 (2d Cir.1974) (noting contrary authority in other Circuits), they are inapposite, as NEPA contains a specific directive to agencies to prepare an environmental impact statement. *See* 42 U.S.C. § 4332(2)(C).

**23.** PhRMA points to a DCH document indicating that, in a particular week, 46 (or 9.77% of) requests for prior authorization were denied. *See* SAR at 389. But this figure apparently represents denials at the pharmacist level, after which an appeal is available. *Id.* at 382–83.

authorized upon the prescribing physician's assurance of the drug's medical necessity." *Id.* at 714.[24]

The remaining objections to the Secretary's approval concern alleged deficiencies in the evidence submitted by DCH (and in turn relied upon by CMS). NUIC argues that DCH's analysis does not quantify the actual savings to the EPIC and MOMS programs as a result of the linkage to Medicaid prior authorization, but rather assumes that EPIC and MOMS would have to be eliminated altogether if Michigan is unable to obtain the rebates its seeks. Moreover, NUIC argues, DCH has not demonstrated that the savings in EPIC and MOMS could not be achieved through other means; instead of using prior authorization as leverage to compel manufacturers to provide rebates lowering the prices of their drugs to those of the "best-priced clinically selected products," NUIC proposes, DCH could create a restrictive formulary for EPIC and MOMS under which only the "best-priced clinically selected products" would be provided.[25]

24. Beyond challenging whether a drug that is medically necessary will always be available through prior authorization, NUIC and PhRMA have submitted thirteen extra-record declarations from patients in support of the contention that Medicaid beneficiaries have been harmed by DCH's prior authorization program. But six of these declarations are from persons who live in Florida and thus are not subject to, or able to provide relevant evidence of harm concerning, the Michigan Initiative. *See* Reply Decl. of Jeffrey Pariser in Further Supp. of Pl.'s Mot. Prelim. Inj., Ex. 8 A, C, E, F, G, H (exhibits filed in connection with litigation in Florida). Six of the remaining seven declarations are likewise lacking in probative value on the issue of harm because they were either signed in December 2001, before the Initiative went into effect, or were executed by persons who, although Michigan Medicaid recipients, are not beneficiaries of the particular Medicaid program that is subject to the Initiative. *See* Reply Declaration of Jeffrey Pariser Further Supp. Pl.'s Mot. Prelim. Inj., Ex. B (Declaration of T.G. (executed Dec. 27, 2001)), Ex. C (Declaration of D.H. (executed Dec. 28, 2001)); Supplemental Declaration of David Viele ¶¶ 2–6.

The final declaration is from a patient whose principal alleged harm from prior authorization appears to stem from the fact that she was "too embarrassed" to inform her doctor that the drugs that had been prescribed for her were not covered by Medicaid. *See* Declaration of Doris Y.Giasson ¶ 5. A contributing factor was that the patient was not advised that drugs could be made available through prior authorization. *Id.* This sole declaration, alleging a harm that could have been ameliorated were the patient more assertive or better informed, is not sufficient to render arbitrary and capricious the Secretary's conclusion that "any incremental burden resulting from the imposition of a prior authorization requirement ... will [not] likely harm Medicaid recipients." SAR at 714. Nor, for that matter, is the Secretary's conclusion undermined by the patient's professed "frustration" with the prior authorization process. *See* Giasson Decl. ¶ 6.

After full summary judgment briefing, NUIC submitted to the Court a report from the Kaiser Foundation describing "stakeholders" ' views about how the Initiative has impacted or may impact the health of Medicaid beneficiaries. Supplemental Declaration of Hubert Huebl, M.D., Ex. A at 3. But the Court will not overturn an agency action based upon a report that was not before the agency at the time of the challenged agency action, that draws conclusions largely from anecdotal evidence, and that contains certain basic factual errors concerning the Initiative.

25. PhRMA argues that DCH provided no empirical support for its estimates concerning the percentage of EPIC and MOMS beneficiaries that would divert to Medicaid in the absence of those programs. But given the low incomes of persons in the EPIC and MOMS populations, the absence of an empirically-supported estimate of the expected rate of migration to Medicaid does not render arbitrary and capricious CMS's conclusion that DCH had demonstrated a sufficient "nexus" and "close relationship" between the EPIC and MOMS populations and the Medicaid program to support a conclusion that continuing prescription drug coverage under the

The Court agrees with NUIC that DCH's submission to CMS in support of SPA 02–019 has some deficiencies. But the "scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). Here, although DCH could have identified more specifically the extent of the expected cutbacks in EPIC and MOMS, and thus quantified more precisely the anticipated burden on Medicaid, DCH's failure to do so does not make the Secretary's approval irrational. Given the fact that the EPIC and MOMS programs are geared towards providing essential prescription drugs for low-income persons, it was reasonable for the Secretary to conclude that, if funding for those programs were reduced, at least some of the EPIC and MOMS participants would likely divert to Medicaid (and in the case of MOMS participants, give birth to Medicaid-eligible children at increased risk for neonatal intensive care) and thus burden the Medicaid program. SAR at 713–714.[26]

Moreover, with respect to NUIC's argument that DCH failed to show that the

imposition of a prior authorization requirement was essential to ensuring continued funding for the EPIC and MOMS programs, neither § 1396a(a)(19) nor the SMD Letter interpreting that provision requires such a showing. Instead, § 1396a(a)(19) provides only that a prior authorization requirement must be beneficial to the Medicaid program as a whole. Here, given the Secretary's conclusion (as discussed above) that Medicaid beneficiaries would not likely be harmed by prior authorization, it was reasonable for the Secretary to conclude that the best interests of the Medicaid program would be advanced, not impaired, by imposing a prior authorization requirement that would preserve the EPIC and MOMS programs and thus prevent diversion of participants into Medicaid.

The propriety of the Secretary's approval of SPA 02–019 is further bolstered by the fact that the Medicaid statute is "designed to advance cooperative federalism." *Wisconsin Dep't of Health & Family Servs. v. Blumer*, 534 U.S. at 495, 122 S.Ct. 962. In such a situation, a court may "leave a range of permissible choices to the States, at least where the superintending federal agency has concluded that such

EPIC and MOMS programs provides a benefit to the Medicaid population as a whole. SAR at 714.

26. The Court notes that on February 14, 2003, CMS denied DCH's proposed amendment seeking to require that, as a condition to evading Medicaid prior authorization, drug manufacturers participate in two additional Michigan non-Medicaid programs, the State Medical Program ("SMP") and the Children's Special Health Care Services Program ("CSHCS"). Notice of Filing (Feb. 14, 2002), Ex. A. In its decision letter, CMS explained that DCH had not established a "sufficient nexus between these two non-Medicaid programs and the State's Medicaid program such that CMS could conclude that imposing prior authorization on prescription drugs in its

Medicaid program would serve the best interests of the Medicaid program as a whole." *Id.* at 1. CMS noted that most of the CSHCS participants would likely have incomes that far exceeded Medicaid financial eligibility standards, and that DCH had not established that participants in SMP would meet the categorical requirements for Medicaid eligibility if the SMP pharmacy benefit were eliminated. *Id.* at 1–2. CMS specifically contrasted DCH's evidence with respect to CSHCS and SMP and the evidence with respect to EPIC and MOMS. *Id.* at 2. CMS's rejection of DCH's attempt to link CSHCS and SMP to a prior authorization requirement reflects an ability carefully to distinguish between state non-Medicaid programs and thus undercuts NUIC's argument that CMS has merely accepted DCH's submissions at face value.

latitude is consistent with the statute's aims." *Id.; see also Alexander,* 469 U.S. at 303, 105 S.Ct. 712 (noting that the Medicaid statute "gives the States substantial discretion to choose the proper mix of amount, scope, and duration on coverage, as long as care and services are provided in 'the best interests of the recipients'"); *Florida Ass'n of Rehab. Facilities, Inc. v. Florida Dep't of Health & Rehab. Servs.,* 225 F.3d 1208, 1211 (11th Cir.2000) (states have "broad latitude in defining the scope of covered services as well as many other key characteristics of their programs"); *Ohio v. United States Dep't of Health & Human Servs.,* 761 F.2d 1187, 1195 (6th Cir.1985) ("The Medicaid Act gives the states considerable latitude in determining the scope of their respective Medicaid programs."); *Michael Reese Phys. & Surgeons, S.C. v. Quern,* 606 F.2d 732, 735 (7th Cir.1979) (Medicaid is "an experiment in cooperative federalism which literally abounds with options" (internal citations omitted)). Here, DCH adduced sufficient support for SPA 02–019 to allow the Secretary to approve the proposed amendment consistent with the reasonable position that the Medicaid prior authorization power can be used as leverage in inducing manufacturer rebates in non-Medicaid programs.

### D. Commerce Clause

PhRMA's remaining claim against the Federal Defendants is that the pricing aspect of the Initiative, which was approved by the Secretary, violates the dormant Commerce Clause. PhRMA argues that the Commerce Clause prohibits state action that has the effect of regulating outside the state. *See* Mem. Supp. Pl.'s Mot. Prelim. Inj. at 28 (citing *Healy v. Beer Inst.,* 491 U.S. 324, 336, 109 S.Ct. 2491, 105 L.Ed.2d 275 (1989), and *Brown–Forman Distillers Corp. v. New York State Liquor Auth.,* 476 U.S. 573, 579, 106 S.Ct. 2080, 90 L.Ed.2d 552 (1986)). Here, PhRMA notes, the Initiative, as approved by the Secretary, requires that manufacturers seeking to avoid prior authorization sign a Supplemental Drug Rebate Agreement and a Non–Medicaid Agreement that effectively reduce the prices of drugs they sell to Michigan for Medicaid use to the lowest prices available within the United States for the "best-priced clinically selected products"—i.e., to the lowest prices available in the United States for the relevant "best in class" drugs. *See* AR at 7–14, 311–12, 314; SAR at 307, 717–724. Thus, PhRMA argues, the Supplemental Drug Rebate Agreement and the Non–Medicaid Agreement together establish out-of-state "benchmarks" for regulating prices—a technique that PhRMA contends was held unconstitutional in *Brown–Forman,* 476 U.S. at 579, 106 S.Ct. 2080, and *Healy,* 491 U.S. at 336–37, 109 S.Ct. 2491. PhRMA claims that the Secretary acted arbitrarily, capriciously, or not in accordance with law in approving the benchmarking notwithstanding this constitutional flaw.

Before addressing the substance of this argument, the Court must consider as a threshold matter whether Michigan is acting as a market participant under the Initiative. The Supreme Court has made "clear that if a State is acting as a market participant, rather than as a market regulator, the dormant Commerce Clause places no limitation on its activities." *South–Central Timber Dev., Inc. v. Wunnicke,* 467 U.S. 82, 93, 104 S.Ct. 2237, 81 L.Ed.2d 71 (1984). While the market participant doctrine is "not carte blanche to impose any conditions that the State has the economic power to dictate, and does not validate any requirement merely because the State imposes it upon someone with whom it is in contractual privity," the doctrine does permit a State to influence

" 'a discrete, identifiable class of economic activity in which [it] is a major participant.' " *Id.* at 97, 104 S.Ct. 2237 (quoting *White v. Mass. Council of Constr. Employers, Inc.,* 460 U.S. 204, 211, n. 7, 103 S.Ct. 1042, 75 L.Ed.2d 1 (1983)). In assessing whether a State is acting as a market participant, a court should consider whether a "private party could have engaged in the same actions." *SSC Corp. v. Smithtown,* 66 F.3d 502, 512 (2d Cir.1995). Where, for example, a state forces others to buy its services under the threat of criminal penalties, the market participant doctrine is inapposite. *Id.*

Here, there are compelling reasons to conclude that Michigan is acting purely as a market participant. First, the state itself is the purchaser of the drugs at issue. Indeed, although Michigan's influence over drug manufacturers derives from its power to impose prior authorization in the Medicaid program, Michigan's leverage in this regard does not necessarily distinguish it from private health maintenance organizations, which similarly may use the threat of restrictions on access to large numbers of health care consumers to obtain price concessions from drug manufacturers. In the present Medicaid context, like the HMO context, it is the lure of the potential profit from a substantial market, not the role of the state as sovereign, that may influence a manufacturer to agree to reduce its prices. Second, the alleged affront to the Commerce Clause is effected not through state legislation but through voluntary agreements. There is no Michigan statute requiring drug manufacturers to provide rebates; they may or may not decide to do so depending upon their assessment of the relevant costs and benefits. Moreover, Michigan does not threaten to impose criminal sanctions or otherwise use its unique position as a sovereign to influence the manufacturers'

cost-benefit analyses. What may ultimately drive manufacturers to provide rebates is their desire for access to a large market in which Michigan, rather than, for example, Blue Cross Blue Shield of Michigan, happens to be the buyer. In short, Michigan simply sought to influence " 'a discrete, identifiable class of economic activity in which [it] is a major participant.' " *South–Central Timber,* 467 U.S. at 93, 104 S.Ct. 2237 (quoting *White,* 460 U.S. at 211 n. 7, 103 S.Ct. 1042).

But the Court need not rest its assessment upon the market participant doctrine alone, because it is plain that there is no dormant Commerce Clause violation here in any event. In reviewing state regulation for possible Commerce Clause violations, this Court must apply "what amounts to a two-tiered approach." *Brown–Forman,* 476 U.S. at 578, 106 S.Ct. 2080. First, the Court must consider whether the Initiative "directly regulates or discriminates against interstate commerce," or has the "effect ... [of] favor[ing] in-state economic interests over out-of-state interests." *Id.* at 579, 106 S.Ct. 2080. If so, then the Initiative (and the Secretary's approval of it) must be struck down without further inquiry. *Id.* However, if, instead, the Initiative "has only indirect effects on interstate commerce and regulates evenhandedly," the court must apply the balancing test set forth in *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970), which "examine[s] whether the State's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits." *Id.*

Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on

such commerce is clearly excessive in relation to the putative local benefits. If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.

*Pike,* 397 U.S. at 142, 90 S.Ct. 844.[27] Notably, the Supreme Court has observed that "there is no clear line separating the category of state regulation that is virtually per se invalid under the Commerce Clause, and the category subject to the *Pike v. Bruce Church* balancing approach. In either situation the critical consideration is the overall effect of the statute on both local and interstate activity." *Brown–Forman,* 476 U.S. at 579, 106 S.Ct. 2080.

Here, the Initiative easily passes the first tier of analysis—the consideration of whether the state action "directly regulates ... interstate commerce," "discriminates against interstate commerce," or has the effect of "favor[ing] in-state economic interests over out-of-state interests." *Id.* To begin with, PhRMA does not argue that the Initiative discriminates against interstate commerce or favors in-state economic interests. Michigan's plan has neither the purpose nor the effect of limiting commerce between States or giving prefer-

ence to in-state drug manufacturers. Thus the only potential issue is whether alleged benchmarking "directly regulates" interstate commerce.

PhRMA relies upon *Brown–Forman* and *Healy* to argue that Michigan has impermissibly regulated out-of-state prices. In *Brown–Forman,* the Supreme Court struck down a New York law requiring liquor distillers to affirm that their prices were no higher than the lowest price at which the same product would be sold anywhere else in the United States during the same month. *Id.* at 575–76, 106 S.Ct. 2080. The Court emphasized that the New York law specifically precluded distillers from changing their prices for liquor anywhere else in the United States during a particular month except upon approval of the New York State Liquor Authority. *Id.* at 582–83, 106 S.Ct. 2080. Thus, the Court held, New York unconstitutionally " 'project[ed] its legislation into [other States] by regulating the price to be paid' for liquor in those States." *Id.* at 583, 106 S.Ct. 2080 (quoting *Baldwin v. G.A.F. Seelig, Inc.,* 294 U.S. 511, 521, 55 S.Ct. 497, 79 L.Ed. 1032 (1935)).

In *Healy,* the Supreme Court reviewed a similar Connecticut law requiring out-of-state shippers of beer to affirm that the prices at which their products were sold to Connecticut wholesalers were no higher than prices at which those same products were sold in bordering states. 491 U.S. at 326, 109 S.Ct. 2491. The Court identified

---

27. Some Circuits have discerned within the Supreme Court's jurisprudence a three-tiered approach to Commerce Clause analysis. In *Concannon,* 249 F.3d at 79, for example, the First Circuit explained that it must consider (1) whether the state statute directly controls commerce occurring wholly outside the boundaries of a state, and thus has a per se invalid extraterritorial reach; (2) whether the state statute discriminates against interstate commerce, and thus should be subjected to strict scrutiny; and (3) whether the state statute regulates evenhandedly with only inciden-

tal effects on interstate commerce, and thus should be subjected to the *Pike* balancing test. *See also Cotto Waxo Co. v. Williams,* 46 F.3d 790, 794 (8th Cir.1995) (discussing three-level approach). For present purposes, it is not consequential whether a two-tier or three-tier analysis is applied. The pricing aspects of the Initiative would survive even the three-tier *Concannon* approach because, as discussed below, Michigan does not through the Initiative directly control out-of-state commerce or discriminate against interstate commerce, nor does the Initiative fail the *Pike* balancing test.

various defects in the Connecticut affirmation statute, among them that the interaction of that statute and a Massachusetts beer-pricing statute had the "practical effect of controlling Massachusetts prices" because a manufacturer setting Massachusetts prices in one month (January, for example) would not only have to take account of the prices he hoped to charge in Connecticut two months later (March), but also would be unable to change his Massachusetts prices during the intervening month (February) absent state administrative leave. *Id.* at 338, 109 S.Ct. 2491. Thus, "as a practical matter, Connecticut's nominally 'contemporaneous' affirmation statute 'prospectively' preclude[d] the alteration of out-of-state prices after the moment of affirmation." *Id.* The Court accordingly held that "the Connecticut statute has the extraterritorial effect, condemned in *Brown–Forman,* of preventing brewers from undertaking competitive pricing in Massachusetts based on prevailing market conditions." *Id.*

Contrary to PhRMA's assertions, the Michigan Initiative at issue here is hardly the equivalent of the statutes struck down in *Brown–Forman* and *Healy.* To be sure, the Initiative may resemble the laws in *Brown–Forman* and *Healy* to the extent that it may influence manufacturers to set out-of-state prices based on considerations other than the prevailing market conditions in those areas. But the Initiative is distinguishable because it does not actually control, fix, or regulate prices out-of-state. Manufacturers setting prices out-of-state may want to account for the effects of their pricing decisions on their Michigan prices, but in contrast to the statutory schemes in *Brown–Forman* and *Healy,* the Initiative does not, either on its own or through interaction with laws in other states, preclude a manufacturer from altering its out-of-state prices once they are set. Manufacturers are free to change out-of-state prices at will. There is thus little basis for concluding that the Initiative "directly regulate[s] commerce" in other states, *Brown–Forman,* 476 U.S. at 584, 106 S.Ct. 2080, or has the "practical effect . . . [of] control[ling] conduct beyond the boundaries of the State," *Healy,* 491 U.S. at 336, 109 S.Ct. 2491. *See also Cotto Waxo Co.,* 46 F.3d at 794 (statute has impermissible extraterritorial effect when it "requires people or businesses to conduct their out-of-state commerce in a certain way").

The Initiative is distinguishable on a further basis as well. Unlike the laws at issue in *Brown–Forman* and *Healy,* the Initiative does not tie in-state prices for a manufacturer's products to out-of-state prices for the same products and, indeed, does not generally tie a manufacturer's in-state prices to out-of-state prices for drugs by the same manufacturer. Rather, the Supplemental Drug Rebate Agreement and the Non–Medicaid Agreement are targeted to achieve an in-state price for a manufacturer's drug that is the same as that of the "best priced clinically selected product"—the lowest price available in the United States for the lowest-priced among the relevant "best in class" drugs. *See* AR at 7–14; SAR at 306–07, 717–724.[28] Thus, although PhRMA argues that the Initiative forces a manufacturer to consider the

---

**28.** DCH argues that the Initiative does not present a Commerce Clause problem because Congress "implicitly authorized the type of pricing methodology employed by Michigan." Intervenor–Def.'s Opp. Pl.'s Mot. Prelim. Inj. at 39. Specifically, DCH notes that 42 U.S.C. § 1396r–8(c)(1) authorizes the Secretary to

provide rebates that target the manufacturer's "best price" for any given drug charged anywhere "within the United States."

But the fact that Congress authorized the Secretary to target the manufacturer's best price nationally for the same drug does not mean that Congress authorized the Secretary

impact of price reductions out of state on its in-state prices, in reality this will occur only in the infrequent (perhaps even rare) situation when (1) the manufacturer offers in Michigan two or more drugs in the same therapeutic class; (2) one of those drugs is the "best-priced clinically selected product"; (3) the manufacturer is seeking to reduce the lowest nationally available price on the "best-priced clinically selected product" (i.e., the manufacturer is seeking to reduce the out-of-state "benchmark" price); and (4) the manufacturer's other drugs in the class are not "best in class," are priced higher than the "best-priced

clinically selected product," and are the subject of a rebate agreement, thus creating the potential that a decrease in the price of the "best-priced clinically selected product" would result in an increased rebate.[29] In sum, the alleged impermissible extraterritorial effect will occur only sporadically and incidentally, placing the Initiative far removed from the laws challenged in *Brown–Forman* and *Healy*.[30]

Indeed, the incidental nature of the extraterritorial effect, combined with the absence of direct regulation over commerce in other states, suggests that the proper framework for assessing the Initiative (and

to approve an agreement by a state targeting the best price nationally of drugs in the same class. "[F]or a state regulation to be removed from the reach of the dormant Commerce Clause, congressional intent must be unmistakably clear." *South–Central Timber*, 467 U.S. at 91, 104 S.Ct. 2237. "[W]hen Congress has not expressly stated its intent and policy to sustain state legislation from attack under the Commerce Clause, [the Court has] no authority to rewrite its legislation based on mere speculation as to what Congress probably had in mind." *New England Power Co. v. New Hampshire*, 455 U.S. 331, 343, 102 S.Ct. 1096, 71 L.Ed.2d 188 (1982) (internal citations and quotation marks omitted).

For essentially the same reason, the Secretary's approval of the pricing scheme in the Initiative does not eliminate the alleged constitutional defect. Although Congress authorized the Secretary to approve state Medicaid plans, it did not unmistakably delegate to him the ability to authorize state programs that violate the Commerce Clause. *See Norfolk S. Corp. v. Oberly*, 822 F.2d 388, 392 & n. 7, 393 (3d Cir.1987) (Secretary of Commerce's approval of federal funding for state program did not remedy potential violation of the Commerce Clause). Whether the head of a federal agency violates the APA by approving a program that is allegedly inconsistent with the Commerce Clause, where the governing statute does not expressly authorize the head of the agency to deny federal approval of a state program on the basis of Commerce Clause concerns, is an issue that need not be resolved here.

**29.** PhRMA also postulates that a drug manufacturer who did not sell the "best-priced clinically selected product" might be reluctant to lower its out-of-state price on one of its products lest that product become the "best-priced clinically selected product." But given that the "best-priced clinically selected product" must be among the "best in class" drugs and price is not a factor in identifying "best in class" drugs, the concern raised by PhRMA could only arise where the manufacturer sells one of the handful of drugs that have already been chosen as "best in class" but is not itself the "best-priced clinically selected product," plus the manufacturer sells another, higher-priced drug in the same class, and the manufacturer seeks to lower the price on its "best in class" drug below the price of the "best-priced clinically selected product."

**30.** It difficult to determine from the record the exact number of instances in which a manufacturer sells more than one drug in a class, one of those drugs is the "best priced clinically selected product," and the manufacturers' other drugs in the class are priced higher and thus subject to prior authorization. At the August 28, 2002, hearing in this matter, counsel for PhRMA identified a single instance in which a manufacturer produced two drugs in the same therapeutic class, one of which was the "best in class" drug. *See* Tr. of Aug. 28, 2002, Hearing at 33. But PhRMA has not identified any evidence that a manufacturer has ever been influenced by DCH's rebate agreements not to reduce the price of a drug outside the State of Michigan.

the Secretary's approval of it) is the balancing approach of *Pike v. Bruce Church*, rather than the per se analysis PhRMA urges. The balancing approach should be applied where, as here, "the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental." *Pike*, 397 U.S. at 142, 90 S.Ct. 844; *see also Concannon*, 249 F.3d at 83 (applying *Pike* balancing test to Maine program to reduce drug prices that "regulates evenhandedly and only has incidental effects on interstate commerce"). The *Pike* balancing test requires a court to weigh the burden on interstate commerce against the putative local benefits of the state regulation. *Pike*, 397 U.S. at 142, 90 S.Ct. 844. Only if the "burden imposed on such commerce is clearly excessive in relation to the putative local benefits" should the state regulation be overturned. *Id.*

Here, as discussed above, interstate commerce will only be burdened in those infrequent (perhaps rare) situations where the manufacturer offers in Michigan two or more drugs in the same therapeutic class, one of those drugs is the "best-priced clinically selected product," and the manufacturer's other drugs in that class are priced higher. Moreover, the burden even in those circumstances is rather minimal; a manufacturer considering a reduction in the price of its drug will have to factor into its decision the consequences of that decision for the pricing in Michigan of its other drugs in the same class, and the manufacturer may, to the detriment of the out-of-state locality, decide not to reduce its price.

The local benefits of the Initiative, on the other hand, are substantial. Michigan,

which is facing a budget crisis and possible cut-backs in its budget for Medicaid and other health care services, is seeking to reduce the costs of its expenditures on health care by securing lower prices for prescription drugs. The Secretary, who has responsibility for administering Medicaid and other health-related programs and whose view is thus entitled to some deference, *see Wisconsin Dep't of Health & Family Servs.*, 534 U.S. at 495, 122 S.Ct. 962 believes that Michigan's efforts to reduce the costs of prescription drugs will benefit the Medicaid program as a whole. The Secretary has specifically noted that Michigan's Initiative may allow it to avoid "some reductions in Medicaid itself ... such as tighter eligibility rules and/or reductions in Medicaid services." SAR at 714.

Weighing these benefits against the incidental burden on commerce posed by the Initiative, the Court concludes that the burden is not clearly excessive in relation to the local benefits. The Commerce Clause does not prevent Michigan from taking steps to ensure the continued provision of government-funded health care services to the indigent based on the possibility that a manufacturer might in theory occasionally be influenced not to reduce an out-of-state price for one of its products.[31]

Ultimately, the "critical consideration in determining whether the extraterritorial reach of a statute violates the Commerce Clause is the overall effect of the statute on both local and interstate commerce." *Healy*, 491 U.S. at 337 n. 14, 109 S.Ct. 2491. Here, where the burden on interstate commerce is incidental and insubstantial, and the offsetting local benefit is significant, the Commerce Clause does not pres-

---

**31.** The Court queries whether Michigan could achieve the desired aggregate level of rebates through a means that would result in "lesser impact on interstate activities," *see Pike*, 397 U.S. at 142, 90 S.Ct. 844—i.e., through a means other than setting an out-of-state benchmark for pricing. But PhRMA has not argued this point, and the burden on interstate commerce is minimal in any event.

ent a barrier. Accordingly, the Secretary did not act arbitrarily, capriciously, or otherwise not in accordance with law in approving the pricing aspect of the Initiative.

## V. Claims Against Michigan

### A. Supremacy Clause

█ PhRMA asserts four claims against DCH under the Supremacy Clause that essentially parallel the claims asserted against the Federal Defendants: (1) that DCH has implemented an "illegal drug formulary"; (2) that DCH has implemented an illegal "supplemental rebate" program; (3) that DCH has leveraged Medicaid for the benefit of non-Medicaid individuals in violation of the "best interests" requirement of 42 U.S.C. § 1396a(a)(19); and (4) that DCH has leveraged Medicaid for the benefit of non-Medicaid individuals in violation of the "best interests" requirement of 42 U.S.C. § 1396a(a)(19) without obtaining the Secretary's approval. The fourth of these claims is no longer viable because DCH has ceased operating aspects of the Initiative that have not been approved by the Secretary. The remainder of the claims fail on their merits.

The Supremacy Clause provides that a federal law may expressly or impliedly preempt state law. U.S. Const. art. VI, cl. 2; *Gade v. Nat'l Solid Wastes Mgmt. Ass'n,* 505 U.S. 88, 98, 112 S.Ct. 2374, 120 L.Ed.2d 73 (1992). There are different species of preemption, *see id.,* only one of which—implied conflict preemption—appears to be relevant here. *See* Second Amended Compl. ¶¶ 72, 79, 87, 92, 102, 109, 111, 116; *see also Concannon,* 249 F.3d at 74–75 n. 6 (holding that only implied conflict preemption was at issue in PhRMA's claim under the Supremacy Clause that Maine's prescription drug program conflicted with federal law).

█ Implied conflict preemption is present "where 'compliance with both federal and state regulations is a physical impossibility,' or where state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Gade,* 505 U.S. at 98, 112 S.Ct. 2374 (internal citations omitted). Notably, where, as here, "coordinate state and federal efforts exist within a complementary administrative framework, and in the pursuit of common purposes, the case for federal pre-emption becomes a less persuasive one." *New York Dep't of Soc. Servs. v. Dublino,* 413 U.S. 405, 421, 93 S.Ct. 2507, 37 L.Ed.2d 688 (1973).

In light of the Court's conclusions, set forth throughout this opinion, that the Secretary acted lawfully in approving the Initiative, there is no basis for any claim that "compliance with both federal and state regulations is a physical impossibility" or that implementation of the Initiative "'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *See Gade,* 505 U.S. at 98, 112 S.Ct. 2374. As the Court has detailed, none of the aspects of the Initiative that PhRMA challenges under the Supremacy Clause—neither the prior authorization program nor the supplemental rebates nor the non-Medicaid linkage to Medicaid prior authorization—are problematic under the Medicaid statute.

### B. Commerce Clause

PhRMA's Commerce Clause claim against DCH relies upon the same theory of "benchmarking" as does its claim against the Federal Defendants. For the reasons stated in Section IV.D. above, therefore, PhRMA's Commerce Clause claim against DCH fails as a matter of law.

### CONCLUSION

The Secretary did not act arbitrarily, capriciously, or otherwise not in accordance with law in approving portions of

the Initiative, including the prior authorization program, the efforts to secure supplemental rebates, and the requirement that drug manufacturers provide rebates in non-Medicaid programs in order to avoid prior authorization for drugs offered for Medicaid use. Nor for that matter did the Secretary act unlawfully in approving the pricing targets established by the Initiative, which are not unconstitutional under the Commerce Clause. Moreover, because the challenged aspects of the Initiative are not inconsistent with the Medicaid statute and because DCH has secured the Secretary's approval of those aspects, there is no basis for a Supremacy Clause challenge against DCH. Accordingly, the Federal Defendants' and DCH's cross-motions for summary judgment will be granted with respect to all claims and judgment will be entered in their favor.

A separate order has been issued on this date.